260 S.W.2d 751 (1953)
JOHN T. BROWN, Inc.
v.
WEBER IMPLEMENT & AUTOMOBILE CO.
No. 43332.
Supreme Court of Missouri, Division No. 2.
September 14, 1953.
*752 Montague Punch, St. Louis, for appellant.
Case, Voyles & Case, T. Jackson Case, St. Louis, for respondent.
BOHLING, Commissioner.
John T. Brown, Inc., an Illinois corporation engaged in the business of buying and selling motor vehicles, instituted this action in two counts against the Weber Implement and Automobile Company, a Missouri corporation engaged in like business. Plaintiff sought $200,000 damages in Count I for breach of contract, and $200,000 actual and $300,000 punitive damages in tort for fraud and deceit in Count II. Defendant's motion for a directed verdict as to each count was sustained at the close of plaintiff's case, and plaintiff has appealed from the judgment entered.
Plaintiff was located at Alton, Illinois, and defendant at St. Louis, Missouri. Defendant was a "Direct Dealer" for Chrysler Corporation in the marketing of its De Soto and Plymouth automobiles in specified areas of Missouri and Illinois, including Alton.
On July 7, 1944, at defendant's place of business, plaintiff, as "Associate Dealer," and defendant, as "Direct Dealer," executed a written contract in triplicate, for the stated purpose of setting forth the terms and conditions under which Associate Dealer purchased for resale from Direct Dealer De Soto and Plymouth products, and which required Associate Dealer to maintain, among other things, a suitable place of business, including appropriate stocks of new motor vehicles, parts and accessories, salesroom et cetera. Plaintiff, as Associate Dealer, acquired the "exclusive right to purchase from Direct Dealer De Soto motor vehicles for resale" and "the non-exclusive right to purchase Plymouth motor vehicles for resale" in a specified area in and around the city of Alton, Illinois, shipments not to be made "except on Associate Dealer's order."
Item 6 of the contract explicitly provided that the relationship "between Associate Dealer and Direct Dealer is not that of principal and agent, and under no circumstances is Associate Dealer to be considered the agent of Direct Dealer."
Other provisions of the contract provided for its termination, so far as material here:
It was expressly agreed "that this agreement shall terminate immediately by its own force without notice from either party in the event of," among others, "(6) the assumption of any other line of motor vehicles for sale by Associate Dealer * *."
Also: "Accordingly it is agreed that this agreement may be terminated at any time upon not less than ninety (90) or more than ninety-five (95) days' written notice *753 by Direct Dealer or upon not less than fifteen (15) or more than twenty (20) days' written notice by Associate Dealer, but either of these periods may be reduced by mutual written consent of Associate Dealer and Direct Dealer." The termination of the agreement operated as a cancellation of all unfilled orders; and under a termination upon Direct Dealer's notice, Direct Dealer agreed to buy and Associate Dealer agreed to sell within thirty days after termination date all unused current model motor vehicles purchased from Direct Dealer by Associate Dealer; and all unused parts for the then current and three preceding models purchased from Direct Dealer, and unused accessories or accessories packages purchased from Direct Dealer within six months of the termination date, the Associate Dealer to deliver said parts and accessories for inspection f. o. b. Direct Dealer's place of business prior to purchase.
The acceptance of orders from Associate Dealer by Direct Dealer after termination, "or any other act of Direct Dealer shall not be construed as a renewal of the agreement nor as a waiver of the termination * * *."
The contract further provided that if the agreement between Chrysler Corporation and Direct Dealer be terminated for any reason, then, subject to the option of Chrysler Corporation to disaffirm, the interest of Direct Dealer in the agreement was, without further act, to be assigned and become vested in Chrysler Corporation; and if such assignment occur, said agreement was to automatically terminate immediately upon the granting by Chrysler Corporation of the sales area described in the agreement to a Direct Dealer of De Soto and Plymouth motor vehicles. The Chrysler Corporation was not a party to the agreement except as above provided.
The acceptance of the contract was recommended by the Regional Manager for St. Louis and approved by the Assistant General Sales Manager, De Soto Division, Chrysler Corporation.
John T. Brown owned ninety-eight of the one hundred shares of John T. Brown, Inc. stock, and was President of plaintiff corporation. Plaintiff conducted its De Soto and Plymouth business at 1610 E. Broadway, Alton, Illinois. Mr. Brown testified he operated the Broadway Cadillac Company and sold Cadillac automobiles and General Motors Corporation's trucks in the same building; and that prior to April 14, 1947, on several occasions in St. Louis, George R. Weber, Jr., President of defendant, informed him that R. M. Rowland and C. C. Schelp, Western Sales Manager at Detroit and Regional Manager at St. Louis, respectively, of De Soto Division, Chrysler Corporation, and he had decided that if plaintiff did not improve the building and facilities, plaintiff could not continue and would be cancelled as Associate Dealer.
Mr. Weber and Charles Custer, Manager of the Wholesale Department of defendant, came to Mr. Brown's office between 9:00 and 10:00 a. m. Monday, April 14, 1947. Plaintiff's case is based on the conversation that occurred at that time. The substance of Mr. Brown's testimony, somewhat conflicting and appearing in different places in the record, is to the following effect:
Mr. Weber and Mr. Custer came to Alton to tell witness that they were going to offer him a cancellation of plaintiff's contract and wanted to know if he would agree to cancel the contract. Mr. Brown argued with them. They stated that the Plymouth and De Soto business had to be separated from the Cadillac and GMC truck business; "that I would have to buy another building for Cadillac and GMC trucks"; and improve 1610 E. Broadway to the extent of 30,000 square feet; and that if this were done plaintiff's contract would not be cancelled. Mr. Brown stated plaintiff would do this, that De Soto and Plymouth were worth it. They stated they were going to forward a termination or cancellation notice to force plaintiff to go on; that: " `If you will go on, we will treat this whole conversation and this letter'I mean treat not the conversation but'treat the letter null and void if you carry out what you have told us you will do.' "
The following day, April 15, 1947, plaintiff received a registered letter from defendant. *754 The letter was dated April 14, 1947, and omitting address and signature read:
"Dear Sirs:
"We refer you to your Sales Agreement, No. 5493 dated July 7th, 1944.
"We wish to refer you to paragraph 8, clause No. 6 reading, `Reasons for Termination other than by Notice' and paragraph 9, reading `Termination by Notice.' We wish to apply these paragraphs giving you ninety (90) days from this date, notice of cancellation of this Dealer Agreement.
"Please consider this final notice of cancellation."
Mr. Brown testified that upon receipt of the letter he "called them on the telephone, asked `if I would go ahead, the cancellation would be treated null and void?' and I was answered, `Yes, sir,' by Mr. Weber and Mr. Custer."
Plaintiff's counsel read portions of depositions given by Mr. Weber and Mr. Custer. We do not develop them fully. Each is to the following effect. After conferring with Mr. Rowland and Mr. Schelp and concluding that the only course to rectify the situation at Alton was to terminate the agreement with plaintiff, they asked Mr. Brown for a mutual termination agreement, offering to supply plaintiff over the next ninety days the same as if defendant gave plaintiff a ninety day termination notice. Mr. Brown stated defendant had the right to cancel the agreement but wanted to do what plaintiff had neglected to do. They answered that defendant had passed that point and wanted a mutual termination agreement. Mr. Brown stated plaintiff was going ahead. Mr. Weber told Mr. Brown he could not force plaintiff to sign a mutual termination agreement; that plaintiff should not spend any money expecting to sell De Soto and Plymouth automobiles in the future, and that as soon as they returned to St. Louis, defendant was going to immediately mail to plaintiff a termination notice. They returned to St. Louis, and prepared and mailed the letter of April 14, 1947, before the noon hour. No oral agreement was entered into.
Chiles Motors, Inc., was incorporated September 13, 1947. Its stock was held by James B. Chiles, Charles Custer, Lester Reinke, employees of defendant, and Louise R. Weber, wife of Mr. Weber. In September, 1947, it was appointed Direct Dealer for De Soto and Plymouth cars in Alton, Illinois.
Plaintiff's trial theory appears to have been that defendant was liable for all expenditures for the changes made if plaintiff used all possible speed in making the changes, no matter when completed, or what may have occurred after April 14, 1947, and although the value of the improvements still exist to plaintiff's benefit.
Plaintiff claims to have expended $116,865 in making changes at 1610 E. Broadway. We understand that the expenditures within the ninety day period could not be stated; that $43,284.15 was expended prior to December 31, 1947; and that the last construction, between September 10, 1948, and November 18, 1949, was a showroom costing $67,023.74.
Mr. Brown testified that he made arrangements to house the Cadillac automobiles and GMC trucks at 512 E. Broadway on June 13, 1947; purchasing the property for $40,000, and expending $37,000 on improvements, which were finished by the end of 1948; that this was at the request of Mr. Weber and Mr. Custer, and also that Mr. Weber "probably would have put it in an alley * * * but I put it in a building." The record discloses that there was correspondence with the owner of 512 E. Broadway in May or June, 1947, but Mr. Brown wrote the owner on August 26, 1947, offering $40,000 for 512 E. Broadway. The owners of the property, Mr. and Mrs. Walter J. Joehl, of Denver, Colorado, executed a deed, dated July 1, 1947, conveying the property to "John T. Brown" but the deed was not acknowledged until September 30, 1947.
Defendant, by its pleading, denied that a contract was made and objected to oral evidence *755 of the contract. The testimony was admitted subject to defendant's objection. We have held in these circumstances that defendants may rely on the statute of frauds. Jones v. Linder, Mo.Sup., 247 S. W.2d 817, 819[1]; State ex rel. Place v. Bland, 353 Mo. 639, 651, 183 S.W.2d 878, 886[8, 9]; Hurt v. Ford, 142 Mo. 283, 300, 44 S.W. 228, 232, 41 L.R.A. 823. Plaintiff's cases, Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, 630, involving an agency contract, and cases there cited, do not establish error.
Section 432.020 RSMo 1949, V.A.M.S., provides, so far as material: "No contract for the sale of goods, wares and merchandise for the price of thirty dollars or upward, shall be allowed to be good * * * unless some note or memorandum in writing be made of the bargain, and signed by the parties to be charged with such contract * * *." The corresponding Illinois statute covers goods of the value of $500 and upwards. S.H.A.Ill.St., Ch. 121 ½, § 4(1).
The instant contract is one for the sale and purchase of motor vehicles and other goods, wares and merchandise. The written contract explicitly so states. Mr. Brown, who signed the contract on behalf of plaintiff, so testified; and that the motor vehicles so purchased cost $850 or more and became the property of plaintiff when purchased. State ex rel. Studebaker Corp. of America v. Trimble, 295 Mo. 667, 247 S.W. 119. Plaintiff may not defeat the termination notice given by defendant under the written contract by the alleged parol agreement between Mr. Brown and Mr. Weber and Mr. Custer. Such an alteration of the terms of the contract, creating a new executory contract, required a writing and may not rest partly in the original written contract and partly in parol. See, among others, Warren v. A. B. Mayer Mfg. Co., 161 Mo. 112, 121, 61 S.W. 644, 646; Curle's Heirs v. Eddy, 24 Mo. 117, 125 66 Am.Dec. 699; Pratt v. Schreiber, 213 Mo.App. 268, 249 S.W. 449, 451[2]; Miller v. Arnold, Mo.App., 51 S.W.2d 124, 125[1].
To sustain its position plaintiff stresses Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, 628[1], 630; Cammann v. Edwards, 340 Mo. 1, 100 S.W.2d 846, 850[11, 12]; and Wade v. Ford Motor Co., 151 Kan. 425, 99 P.2d 775. These cases involved contracts of agency. Plaintiff's cases recognize that the statute of frauds, which covers the sale of goods, wares and merchandise, has no application to a mere agency contract. Item "6" of the contract, quoted supra, explicitly stated plaintiff was not the agent of defendant.
Plaintiff may not maintain its action for a breach of the alleged parol contract of April 14, 1947.
Defendant says plaintiff did not establish actionable fraud and deceit. It was essential to a recovery to establish a representation; its falsity; its materiality; the speaker's knowledge of its falsity; his intent that it be acted on by the hearer and in the manner reasonably contemplated; the hearer's ignorance of its falsity; his reliance on its truth; his right to rely thereon; and his consequent and proximate injury. A failure to establish any one of these elements is fatal to a recovery. Powers v. Shore, Mo.Sup., 248 S.W.2d 1, 5[2-4], citing authority; Conley v. Kaney, Mo.Sup., 250 S.W.2d 350, 352[1]; Thomson v. Miner, 303 Ill.App. 335, 25 N.E.2d 137[3].
We summarize some additional facts. Although plaintiff claims Mr. Brown did not know that defendant's representations were false until the incorporation of Chiles Motors, Inc., in September, 1947, Mr. Brown also testified that he was in Mr. Weber's office during the ninety day period following April 15, 1947, and J. B. Chiles, of defendant's wholesale division, who was also in the office, stated defendant was not going to give the Associate Dealership back to plaintiff; and that on the ninetieth day he (Brown) was in defendant's office and said: " `The ninety days is up, gentlemen, what are you going to do?' " And Lester Reinke, General Manager for defendant, answered: " `Quit begging; you are not going to get it back. They won't let you have it.' "
Plaintiff ordered no cars from defendant after July 14, 1947. In a letter to defendant *756 of August 13, 1947, plaintiff stated: " * * * we feel it is our duty to return the parts and signs as mentioned in our contract. * * *" Mr. Brown testified that plaintiff lived up to the contract by tendering the parts back to defendant in writing.
On July 9, 1947, De Soto Division of Chrysler Corporation advised defendant that it was changing its policy and creating Direct Dealerships to replace Associate Dealerships to meet price competition; and on July 15, 1947, advised defendant that, effective December 31, 1947, eighteen named points were to be deleted from defendant's "Sales Area, in order that they may be re-signed on a Direct Dealer basis." All specified areas carried the name of a designated dealer to be so "re-signed" with the exception of Alton, Illinois, which was designated as an "Open Point."
Mr. Brown testified that prior to July 15, 1947, Mr. Weber informed him he was losing some of his dealerships; that plaintiff could contact Chrysler Corporation for a Direct Dealership, and that he went to Detroit, he stated, for an Associate Dealership. On September 4, 1947, De Soto Division of Chrysler Corporation advised plaintiff that it could find no valid reason for reversing its St. Louis Regional Manager's decision to look elsewhere for a dealer in Alton.
Mr. Brown organized the Alton Nash Company and was selling Nash automobiles at 512 E. Broadway, Alton, Illinois, the first part of September, 1947, and Cadillac automobiles and GMC trucks at 1610 E. Broadway.
Payments for the changes at 1610 E. Broadway were made by Broadway Cadillac Company checks, signed "Broadway Cadillac Company by John T. Brown." The contractor who performed the work also so testified and, in addition, that the work started on June 27, 1947, and ended November 18, 1949. The contractor testified, during an offer of proof, that the work at 512 E. Broadway started on November 12, 1947, and was carried on his ledger under the name of "John T. Brown"; and Mr. Brown said this work was finished by the end of 1948. A public accountant, who audited the records for Mr. Brown monthly, testified that the first expenditure for the leasehold improvement account at 1610 E. Broadway was dated July 31, 1947; that he was testifying from Broadway Cadillac Company's general ledger; that "everything in there was charged against Broadway Cadillac," and that Broadway Cadillac Company was a separate entity. The plaintiff in this action is John T. Brown, Inc.
Plaintiff's counsel asked Mr. Brown: "Q. Those statements you claim took place on the morning of April 14, 1947, did you believe those representations, that they would give you back the agency if you would go on and do the work? A. I believed them to be false right then, but I went on just the same, hoping that they weren't false." He also gave affirmative answers to leading questions whether he "believed they would do it," "believed they were going to keep their word." Upon inquiry by the court, Mr. Brown again stated that he believed the representations to be false right then; "Yes, doubted them, I had been doubting them for two years in advance"; that he knew plaintiff would not continue as Associate Dealer, on September 13, 1947, "when they actually put themselves in Alton"; that during that period "I still had a tiny bit of hope"; "I was doubtful, yes, sir. I believed, but I didn't know for sure. Let's put it that way." The court informed the witness that he had answered the inquiry in two different ways. Defendant's representations were made to Mr. Brown, who was President of plaintiff corporation and owned ninety-eight of its one hundred shares of stock. The situation with respect to plaintiff's belief in, reliance upon, and being deceived by defendant's representations seemingly falls within the observation in Steele v. Kansas City Southern R. Co., 265 Mo. 97, 115, 175 S.W. 177, 181, and other cases, to the effect that present only that inference deductible from a desire to obtain a verdict and absent any reasonable excuse or explanation, "what you said to-day, since it contradicts what you said on yesterday, *757 also cancels it, and you have, at the best that may be said, no proof upon a point vital to your case."
Morel v. Masalski, 333 Ill. 41, 164 N.E. 205, 207, states: "If it appears that there were facts and circumstances present at the time the false representations were made sufficient to put the injured party upon his guard or to cast suspicion upon their truth, and he neglected to avail himself of the warning thus given, he will not afterwards be heard to complain, for the reason that his own conduct contributed to his injury." Conklin v. Missouri Pac. R. Co., 331 Mo. 734, 55 S.W.2d 306, 308(I); Orlann v. Laederich, 338 Mo. 783, 92 S.W.2d 190, 194, 195. Consult Reed v. Cooke, 331 Mo. 507, 55 S.W.2d 275, 278[5,6]; 49 Am.Jur. 838, §§ 538, 539, nn. 17-19; 23 Am.Jur. 889, §§ 108, 109; 37 C.J.S., Frauds, Statute of, §§ 217, 224, page 713.
The judgment should be and is affirmed.
WESTHUES and BARRETT, CC., concur.
PER CURIAM.
The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.
All concur.