**Dennis B. LUTSKY and Judith Lutsky, Plaintiffs-Respondents,**

v.

**BLUE CROSS HOSPITAL SERVICE, INC., OF MISSOURI and Missouri Medical Service, d/b/a Blue Shield, Defendants-Appellants.**

No. 66698.

Supreme Court of Missouri, En Banc.

Aug. 7, 1985.

As Modified on Denial of Rehearing Sept. 10, 1985.

Martin J. Toft, Jonathan W. Igoe, Ann E. Buckley, Henry J. Mohrman, St. Louis, for defendants-appellants.

Norton Y. Beilenson, Ralph M. Lake, Clayton, for plaintiffs-respondents.

BLACKMAR, Judge.

The plaintiffs became members of the Missouri Farm Bureau Federation (Farm Bureau) in May, 1981. This membership made them eligible for a group health care plan (Com-Pac) provided by defendants Blue Cross Hospital Service, Inc. of Missouri and Missouri Medical Service (Blue Shield). Plaintiffs applied for membership in the Com-Pac program and were issued a membership card insuring themselves and their minor son, Loren.

On October 8, 1981 Loren became a patient at Meninger Foundation Children's Hospital in Topeka, Kansas, for treatment of a mental illness, and remained there until, at least, the time of judgment in the trial court. His expenses for hospital and medical care were paid by defendants through November of 1982. On December 1, 1982, the Com-Pac program was replaced by a new program emanating from the defendants, and denominated the "comprehensive" plan. Under Com-Pac, the lifetime maximum for hospital and medical service to any one person was stated to be $1,000,000. The Comprehensive Program maintained the $1,000,000 maximum except for mental illness, as to which an annual maximum of $5,000 and a lifetime maximum of $25,000 were specified. The defendants claim that benefits for Loren's illness after December 1, 1982 are subject to the limits of the comprehensive program.

The plaintiffs filed suit for declaratory judgment and damages. The trial court entered summary judgment for the plaintiffs in the amount of $84,219.34 on account of expenses incurred up to the time of judgment, and directed the payment of future benefits for Loren's illness and hospitalization. The judge prepared a helpful opinion in support of his judgment, concluding that the $1,000,000 maximum applied to an illness having its inception while the Com-Pac contracts were in force and that this limit could not be cut down, as to a particular type of illness, by subsequent agreement between the defendants and the sponsor, Farm Bureau. A count based on deceptive advertising was dismissed with prejudice. Only the defendants have appealed.

The Court of Appeals, Eastern District, reversed, holding that the contract modification was expressly permitted as provided for in the contracts between the defendants and Farm Bureau. The court also held that, by reason of these contracts, the only benefits payable were for those provided by the contracts in force when the covered services were rendered. Primary reliance was placed on *Robin v. Blue Cross Hospital Service, Inc.*, 637 S.W.2d 695 (Mo. banc 1982).

We granted transfer and now take the case as on original appeal. We agree with both the trial court and the Court of Appeals that there are no fact issues and that the case is ripe for decision. We conclude that the trial court correctly determined the issues, and affirm its judgment.

1. The Contractual Provisions

The parties are not in agreement as to the governing contract terms. The plaintiffs attached to their petition five exhibits, as follows:

A. An agreement, undated, between defendant Blue Cross Hospital Service, Inc. of Missouri and Farm Bureau entitled "Group Hospitalization Certificate", providing for hospital care.

B. An agreement, undated, between defendant Missouri Medical Service and Farm Bureau entitled "Group Medical-Surgical Certificate" and providing for medical care.

C. An agreement, undated, between both defendants and Farm Bureau entitled "Group Major Medical Certificate", providing for reimbursement for excess costs. (Benefits under this particular agreement are not involved in the present litigation).

D. A document alleged to have been furnished by the defendants to prospective sponsors, defining and explaining the features of the Com-Pac plan, and containing the statement, "and to insure adequate protection in case of severe illness or accident, the new program will provide up to $1,000,000 in benefits, per person, during a lifetime."

E. A six-page brochure alleged to have been furnished by the defendants to Farm Bureau members, explaining the program highlights. This brochure explains the co-payment feature up to a "loss-sharing maximum", and then goes on to provide that, after that maximum is reached, "the program pays 100 per cent of any additional eligible expenses incurred by that individual during the rest of that year, *up to the life-time maximum of $1,000,000 per person.*"

We will, for convenience, use the exhibit designations employed in the petition. Exhibit E contains a statement as follows:

Complete details of benefits and terms under which they are provided are contained in the Master Group Membership Certificate on file with Missouri Farm Bureau and the St. Louis Blue Cross and Blue Shield office.

■ The defendants argue that Exhibits D and E were not properly authenticated, by affidavit or otherwise, and therefore were not appropriate for consideration in ruling a motion for summary judgment. We conclude, however, that the defendants must be held to have judicially admitted that these documents emanated from them and were tendered to Farm Bureau and to prospective members as containing an authentic description of the Com-Pac plan and the available benefits. To the portion of the petition incorporating and characterizing Exhibits D and E, the defendants answered as follows:

12. Defendants admit that Exhibits "D" and "E" have reference to the Com-Pac program provided by these defendants. Defendants state that those exhibits speak for themselves and defendants deny each and every other allegation of paragraph 12 of plaintiffs' petition.

The portion of the answer quoted above certainly does not constitute a denial within the meaning of Rule 55.23, which provides as follows:

When any claim or defense is founded upon a written instrument and the same shall be set up at length in the pleading or a copy attached thereto as an exhibit, the execution of such instrument shall be deemed confessed unless the party charged to have executed the same shall specifically deny the execution thereof.

It is the sense of the rule that the answering defendant must clearly state its position if an issue of authenticity of a document attached to the petition is intended to be raised. By reason of the failure of specific denial, then, Exhibits D and E were properly before the trial court for consideration in ruling on the motion for summary judgment.

The defendants, in admitting the authorship of Exhibits D and E, do not of course admit the plaintiffs' characterization of these documents. Still to be decided is the question of their contractual effect. The Court of Appeals held simply that "the advertising brochure is not a part of the contract sued upon." [1] We disagree.

---

1. Counsel for the defendants stated in oral argument, here, "I don't have any quarrel with the question that brochures can be a part of the

The Blue Cross Agreement, (Exhibit A) provides in paragraph II–A as follows:

The Membership Agreement shall consist of the written application of the member, BCHS enrollment regulations in force from time to time, the enrollment agreement, if any, between BCHS and the Group Sponsor, the membership card, this Group Comprehensive Program Certificate and duly executed riders, and the provisions of the bylaws of BCHS as amended from time to time. The aforesaid constitute the entire agreement between the parties. No officer, employee or agent of BCHS is authorized to vary or change any of the terms hereof. This Certificate supersedes all prior membership certificates.

Exhibits A, B and C clearly do not contain all essential contract terms. Exhibit A refers to, but does not define, "program benefit maximum" and "loss sharing maximum". Exhibit B contains similar references without specification. Neither of these documents, nor Exhibit C, contains any reference to the $1,000,000 per person lifetime benefit maximum. It is obviously necessary to look elsewhere to flesh out the contractual provisions.

There is no evidence of "BCHS regulations ...," or an "enrollment agreement" or "the provisions of the by-laws of BCHS" or amendments to these, all of which are said to be parts of the "membership agreement." The written application of the plaintiffs and their membership card were brought before the trial court, but neither of these contains all provisions necessary to complete the contract. We do not understand the defendants to claim that there are other material contractual provisions which were not before the trial court. They had the duty, in responding to the motion for summary judgment, to bring any further provisions to the court's attention. Rule 74.04(e).

■ It is apparent, then, that Exhibits D and E contain provisions found nowhere

contract." *See Morris v. Travelers Insurance*

else which are essential to a complete contract, and that they have contractual force. *Cf. Bellamy v. Pacific Mutual Life Insurance Co.*, 651 S.W.2d 490 (Mo. banc 1983); *Morris v. Travelers Insurance Company, supra.* Because all essential contractual provisions were before the court, and the facts of mental illness and ensuing hospitalization are not disputed, there are no remaining issues of fact and the case was appropriate for disposition on motion for summary judgment.

### 2. Application of the Contract

The defendants claim that, under a proper construction of the contract, they had every right to reach agreement with Farm Bureau on a new program to supplant the existing Com-Pac program. They point to such provisions as the following:

G. If the Group Sponsor terminates its enrollment agreement with BCHS, or makes available to the group another group hospital care program, or indemnity therefor, this Certificate shall terminate with the termination of the enrollment agreement or on the effective date of such other program, without regular conversion privileges. (From Exhibit A)

A. The plans reserve the right to change the benefits provisions, terms or conditions of the Contract or change the applicable dues at the end of any contract year by giving written notice to the Employer thirty (30) days prior to such date. Mailing of such notice to the Employer shall constitute notice to the Member. (From Exhibit C).

The defendants next argue that, following the adoption of the Comprehensive plan to replace the Com-Pac plan, the only benefits payable are those provided in the new plan. They cite provisions such as the following:

MEMBERSHIP BENEFITS. Those benefits described in this Certificate, which become applicable to a participant, as

*Co.*, 546 S.W.2d 477, 486 (Mo.App.1976).

evidenced by his membership card and by the records of BCHS. The membership benefits shall, in any case, be the ones for which dues are being charged and remitted at the time hospital care is provided hereunder. ALL OF THE BENEFITS PROVIDED UNDER THIS CERTIFICATE WHERE THE TOTAL CHARGE IS $50.00 OR MORE ARE SUBJECT TO COORDINATION OF BENEFITS AS DEFINED IN ARTICLE IX. (From Exhibit A).

\*    \*    \*    \*    \*    \*

E. Cancellation or termination of this Agreement for any reason will automatically terminate the rights and privileges herein specified for all participants EXCEPT that upon the death of the member, membership for the surviving participants may be obtained by the first dependent filing an application within 30 days after such death and paying the dues or all hospitals furnishing services to the participant under this Agreement are authorized and directed to furnish MMS any and all information and records, or copies of records, relating to the history, diagnosis, treatment and care of the participant in such form as MMS shall prescribe. (From Exhibit B).

■ It is widely held that insurance contracts are to be construed strictly against the insurer and that any ambiguity is to be resolved in favor of the persons insured.[2] The defendants observe that they are not, strictly speaking, insurance companies, but rather Health Services Corporations (Ch. 354, RSMo). Contracts between such companies and the beneficiaries under their plans, however, are construed in the same manner as insurance contracts.[3]

■ Numerous cases, over the years, have dealt with the problem of medical expense occasioned by accident or illness commencing while insurance coverage is in force and continuing after the governing policy terminates through expiration, lapse, program modification, or otherwise. When the event insured against is accident or illness there is a tendency to hold that benefits payable to the insured for an existing condition continue in accordance with policy terms in force at the onset, even though the governing policy is terminated or modified while hospitalization or treatment is still necessary.[4] The defendants point out, however, that their contracts provide hospital and medical care rather than insuring against events of illness or accident, that payment is made directly to the provider rather than to an insured, and that the contractual documents state very clearly that the benefits payable are only such as are provided by the contracts in effect at the time the expenses are incurred. Substantial and respectable authority holds that contracts such as the defendants describe are valid and enforceable in accordance with their terms.[5]

If the defendants are correct, then the provision for $1,000,000 lifetime benefits per person is illusory to the point of being positively deceptive. This provision might lead members to believe that they would be protected against catastrophic and prolonged illness which strikes all too often without warning, whereas, by the defendants contentions, the protection would continue only so long as the insurer and the sponsor did not change the coverage. By the defendants' argument, indeed, modifications could be made in order to forestall further payments on account of an existing

---

**2.** *Bellamy v. Pacific Mutual Life Insurance Company, supra; United States Fidelity and Guarantee Company v. Safeco Insurance Company of America,* 522 S.W.2d 809 (Mo. banc 1975).

**3.** *North Kansas City Memorial Hospital v. Wiley,* 385 S.W.2d 218 (Mo.App.1964); *Myers v. Kitsip*

*Physicians Service,* 78 Wash.2d 286, 474 P.2d 109 (1970).

**4.** 75 A.L.R.2d 876 (1961).

**5.** *Robin v. Blue Cross Hospital Service, Inc.,* 637 S.W.2d 695 (Mo. banc 1982); cases cited Notes 10 and 11, *infra.*

disability.[6] Such a state of affairs, at the very least, is occasion for a raising of the judicial eyebrow.

We conclude that the contractual force of Exhibits D and E is such that a limit below $1,000,000 may not be imposed on the hospital or medical benefits available for an illness or injury requiring hospitalization and having its inception while the $1,000,000 limitation is in effect. The attempt to impose a $5,000 annual and a $25,000 lifetime limit on benefits payable for mental illness, then, is ineffective as to Loren's illness. Any other reading would render the manifestation of coverage up to $1,000,000 of no value to the beneficiaries. We are not impressed by the defendants' argument that the $1,000,000 figure is merely a cap. The language used is indicative of mutuality of benefit.

By reason of our conclusion just stated, any provision of the contract documents which, standing alone, might support the defendants' contentions, is ineffective to impose the enacted ceiling on mental illness benefits. If a contract promises something at one point and takes it away at another, there is an ambiguity.[7] Such an ambiguity is patent, rather than latent, and may be resolved within the four corners rather than by means of extrinsic aids.[8] Because the ambiguity is in an insurance contract it is to be resolved in favor of the insured and against the insurer. *Robin, supra* at 698. Under our reading of the contract the trial court reached the proper conclusion.

The contract provisions relied on by the defendants, moreover, are not so clear and certain as they represent. Paragraph IV.A of Exhibit A provides as follows:

Hospital care under this Certificate will be provided only upon the authorization and request of their attending physician, who must be acceptable to the selected hospital. Nothing herein shall be construed as altering the participant's free choice of a physician or surgeon. Hospital care, subject to all other provisions of this Certificate, shall continue only while the participant is under the treatment or care of his physician, *and shall end when such participant is discharged as a hospital patient by the attending physician.* (Emphasis supplied)

This provision would surely suggest to the casual reader that an entire hospital stay which commences while coverage is in force is to be covered, and is not to be affected by later modification or termination of the contracts.

The conversion privileges provide that "membership ... shall be continuous from the time of the original service date of the terminated coverage." The new "comprehensive" program did not purport to abrogate benefits for conditions having their origin prior to the date of inception of the new program, except for mental illness. Careful reading of all of the contract provisions discloses no express sanction for imposing a limitation on benefits for a particular medical condition.

**6.** *Cf. Myers v. Kitsip Physicians Service, supra* at note 3.

**7.** Conflicting clauses in a policy should be reconciled so far as their language reasonably permits; when reconciliation fails, however, inconsistent provisions will be construed in favor of the insured. *Bellamy, supra* at 496; *Heald v. Aetna Life Ins. Co. of Hartford,* Conn., 104 S.W.2d 379, 383 (Mo.1937); *Drucker v. Western Indemnity Co.,* 223 S.W. 989, 992 (Mo.App.1920). *See also Fadden v. Cambridge Mut. Fire Ins. Co.,* 51 Misc.2d 858, 274 N.Y.S.2d 235, 240 (1966) affirmed 27 A.D.2d 487, 280 N.Y.S.2d 209 (1967) and *Scott v. Keever,* 212 Kan. 719, 512 P.2d 346, 350 (1973) holding that the language of an insurance contract is ambiguous when there is contradictory or necessarily inconsistent language in different portions of the instrument.

**8.** Patent ambiguities, historically, have been resolved within the perimeter of the contract. *See Meinhardt v. White,* 341 Mo. 446, 107 S.W.2d 1061 (Mo.1937); *Romine v. Haag,* 178 S.W. 147 (Mo.1915); *Mudd v. Dillon,* 166 Mo. 110, 65 S.W. 973 (1901); *Campbell v. Johnson,* 44 Mo. 247 (Mo.1869). Although the distinction between patent and latent ambiguities is disappearing and there is now a tendency to admit parol evidence in cases of patent ambiguities, there is nothing which requires such evidence. *See Campbell v. Dixon,* 647 S.W.2d 617, 621 (Mo.App.1983).

Our conclusion is consistent with *Danzig v. Dikman*, (1980), 78 A.D.2d 303, 434 N.Y. S.2d 217, affirmed 53 N.Y.2d 926, 440 N.Y. S.2d 925, 423 N.E.2d 402 (N.Y.1981). There a subscriber suffered a disabling stroke requiring full time nursing care. The coverage in effect at the time of the disability contained no limitation on reimbursement for private duty nursing, but a subsequent modification limited such reimbursement to $5,000 annually. The court held that the limitation was not effective to limit the benefits payable to the plaintiff.

Likewise consistent is *Myers v. Kitsip Physicians Service, supra*, in which a person covered by a health care provider contract suffered kidney failure, requiring hemodialysis. The plan was then modified to exclude coverage for this kind of treatment. The court held that the attempted exclusion was ineffective as to the plaintiff. The defendant argued that each year's coverage constituted a separate contract, but the opinion pointed to provisions indicating continuity of coverage and held that these gave rise to an ambiguity.

The defendants seek to distinguish *Danzig* and *Myers*, asserting that they are based on a "reasonable expectation" theory assertedly rejected by this Court in *Robin*. They misread *Robin*, the essential holding of which is that group health services contracts in which the sponsor is a substantial business corporation are not "contracts of adhesion." In so holding we cut off at the pass the claim that we should not give effect to plain and unambiguous contract terms, simply because a disadvantaged insured might reasonably expect something different. Our present conclusion is based on the rejection of the defendants' claim that the contract language is clearly in their favor. If the language does not clearly support the plaintiffs' position, it is at least ambiguous.

We do not need to discuss additional authorities from other states. There are other cases supportive of our conclusion.[9] Of those adduced in support of a contrary provision, none involved an attempt to impose a limitation on benefits of a particular type, while substantially maintaining the health services program in effect at the inception of the disability. Cases involving termination of the entire program[10] or termination of the insured's membership[11] are not fully in point. We would reject, furthermore, a defense based on the hypothesis of the complete cancellation of the existing program and the substitution of a brand new one. The Com-Pac program has provisions, detailed earlier, consistent only with continuity. The very specification of a "program maximum benefit" figure is inconsistent with the proposition that the old program has been completely superseded by a new one offered by the same providers.

*Robin v. Blue Cross Hospital Service, Inc., supra*, does not compel a contrary

---

9. *Wardlow v. Kalispell General Hospital,* 164 Mont. 59, 518 P.2d 1164 (1974); *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982); *Blissenbach v. Provident Life & Accident Insurance Company,* 689 S.W.2d 707 (Mo.App.1985).

10. *Hamilton v. Travelers Insurance Co.,* 587 F.Supp. 521 (D.C.E.D.Mo.1984), affirmed 752 F.2d 1350 (8th Cir.1985); *St. Paul Fire & Marine Insurance Co. v. Purdy,* 129 Ga.App. 356, 199 S.E.2d 567 (1973); *Cohen v. Northwestern National Life Insurance Co.,* 124 Ill.App. 15, 259 N.E.2d 865 (1970); *Bartulis v. Metropolitan Life Insurance Co.,* 72 Ill.App.2d 267, 218 N.E.2d 225 (1966); *Tabb v. Louisiana Health Services & Indemnity Co.,* 352 So.2d 771 (La.App.1977) *reversed on other grounds,* 361 So.2d 862 (La. 1978); *Northwestern National Life Insurance Co.*

v. *Glenn,* 568 S.W.2d 693 (Tex.App.1978). *But see Blue Cross Blue Shield of Alabama v. Turner,* 43 Ala.App. 542, 195 So.2d 807 (1966), holding that maternity benefits "vested" at the time of conception and survived the termination of the policy.

11. *Robin v. Blue Cross Hospital Service, Inc., supra; Wulfenstein v. Deseret Mutual Benefit Association,* 611 P.2d 360 (Utah, 1980). *But see Sparks v. Republic National Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982), *cert. den. Republic Nat. Life Ins. Co. v. Sparks,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982) in which employee's benefits for prior accident were held to continue in spite of employer's failure to remit premium.

conclusion. The plaintiff sustained an injury while employed and covered by a group health plan. She was unable to return to work and her employment was terminated. Her employer understandably paid no more dues for her following termination of her employment, and she did not avail herself of the privilege of converting to individual coverage even though advised of her right to do so. We held that the provisions of the contract providing that continued membership was necessary to maintain coverage were clear, unambiguous and enforceable. The case is fully distinguishable.

The defendants cannot improve their position by pointing to the reference in Exhibit E to the "Master Group Membership Certificate." The master agreements, as earlier pointed out, contain no figures for maximum coverage, and so do not contradict Exhibit E.

The defendants argue that there is no showing that the plaintiffs ever relied on, or even read, the provisions of Exhibits D and E. By the position we adopt no such showing is necessary. Exhibits D and E are parts of the governing contract. The parties are often held to contract provisions which they have not read. There is no reason why these provisions should not be applied in favor of a non-reader, as well as against.

### 3. Joint and Several Liability

■ The defendants complain that the trial court improperly imposed joint and several liability. Although each defendant executed a separate contract with Farm Bureau, the individual members were presented with a joint package and a single membership card. The $1,000,000 limit is expressed without segregation as to the particular provider. The defendants did not seek apportionment in the trial court. *Spink v. Mercury Insurance Co.*, 260 S.W.2d 757 (Mo.App.1953), involved separate policies of two insurers covering the same loss, and is clearly distinguishable. There was no error in the entry of a joint judgment.

The judgment is affirmed.

HIGGINS, C.J., BILLINGS and RENDLEN, JJ., and TURNAGE, Special Judge, concur.

DONNELLY, J., dissents in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed.

ROBERTSON, J., not participating because not a member of the Court when cause was submitted.

DONNELLY, Judge, dissenting.

In my view, equity does not license *a court* to take from one and give to another for no reason other than compassion. *See Calder v. Bull*, 3 Dall 386, 3 U.S. 386, 1 L.Ed. 648 (1798).

I join my brother Welliver in adopting the Court of Appeals opinion as my dissent.

WELLIVER, Judge, dissenting.

I respectfully dissent for the reason that the Court of Appeals, Eastern District, properly construed the contract while the majority herein would rewrite the contract. I adopt the Court of Appeals opinion as my dissent and quote the same in its entirety.

"Defendants appeal from the entry of summary judgment in favor of plaintiffs on Count I of their petition based on breach of contract.

"The facts, established through pleadings, affidavits and exhibits are not in dispute. In May, 1981, plaintiffs Dennis B. and Judith Lutsky became members of the Missouri Farm Bureau Federation, St. Louis County Farm Bureau Chapter. Defendants, Blue Cross Hospital Service, Inc. of Missouri and Missouri Medical Service (Blue Shield) provided health group benefits for the Federation members who purchased their health care plan. The group health care plan (Com-Pac) covered basic and major medical expenses up to the lifetime maximum of $1,000,000.00 per person. Plaintiffs applied for membership in the

Com-Pac program and were issued certificates insuring themselves and their minor son, Loren.

"On October 8, 1981, Loren was admitted to the Menninger Foundation Children's Hospital in Topeka, Kansas for treatment of a mental illness. He has remained a patient there continuously since that date. Through November, 1982, under the Com-Pac agreement, defendants paid for treatment of plaintiffs' son.

"During 1982, the Federation and defendants entered into negotiations resulting in the offer to Federation members of a new program of health care insurance. The new plan, the "Comprehensive Program" replaced the "Com-Pac" agreement and drastically reduced the coverage for mental illness. Specifically, the maximum benefit allowed under this plan was 30 days per calendar year and a maximum lifetime benefit of $25,000.00. The bills for Loren's treatment are in excess of both the calendar benefit and the lifetime benefit for mental illness. The new program became effective on December 1, 1982 and defendants have refused to pay plaintiffs for treatment of their son since that date.

"Plaintiffs brought this action for declaratory judgment and damages. They claimed defendants were obligated to pay for their son's hospitalization and physician's care pursuant to the discontinued Com-Pac program in effect when their son became hospitalized. Defendants maintain the Com-Pac program had terminated when the comprehensive plan became effective and their obligations under the former ended. The disagreement between the parties is clearly stated in two paragraphs of plaintiffs' petition:

15. That on or about the 1st day of December, 1982, Defendants and the said Missouri Farm Bureau Federation negotiated a new Group Comprehensive Program of coverage and adopted another plan of coverage, and thereupon Defendants refused and denied any further coverage to said Loren Lutsky for the medical expense, including basic medical expense and major medical expense, and other such medical and hospital and surgical care being provided to him for the medical condition of Loren Lutsky for which he was admitted to said hereinabove referred to hospital on October 8, 1981, as agreed to be rendered under Exhibits "A" thru "E"; that said acts of Defendant were done without the consent or waiver by Plaintiffs of Plaintiffs' vested rights to the continuance of payments under said certificates.

16. That Defendants have contended that they are not liable for said care rendered to Loren Lutsky pursuant to Exhibits "A" thru "E" for such care rendered after the 1st day of December, 1982 by reason of that provision set forth in Exhibit "A", Section VII, subparagraph G, at page 14 thereof, which states as follows:

If the Group Sponsor terminates its enrollment agreement with BCHS, or makes available to the group another group hospital care program, or indemnity thereof, this Certificate shall terminate with the termination of the enrollment agreement or on the effective date of such other program, without regular conversion privileges.

The trial court granted plaintiffs' motion for summary judgment awarding $84,219.34 in damages and ordering defendants to pay additional necessary and required expenses up to the limit and extent of the original Com-Pac agreement. We reverse.

"From the allegations of plaintiffs' petition it is evident that plaintiffs do not dispute the fact that the Missouri Farm Bureau Federation, the group sponsor, has made available another group hospital care program and that this is a contingency which triggers termination of the Com-Pac contract. Rather, plaintiffs' posit their claim to continued benefits under the original contract on their contention that their rights thereunder became vested prior to termination and therefore may not be

changed, modified or eliminated without their consent.

"It is well settled that a master group policy can be cancelled or modified by the group sponsor, so as to terminate the coverage of an individual member, without the latter's consent, if such a right is given by the contract. *Satz v. Prudential Insurance Company of America,* 225 S.W.2d 480, 482 (Mo.App.1949). *See* Annot. *Group Policy Coverage Termination,* 68 A.L.R.2d 249, 255. However, to defeat liability on an insurance contract, the termination must be effective before any liability attaches. *Kingsland v. Missouri State Life Insurance Company,* 66 S.W.2d 959, 961 (Mo.App.1934), *rev'd on other grounds, Schuerman v. General American Life Ins. Co.,* 106 S.W.2d 920 (Mo.App.1937). Thus, the issue as framed by plaintiffs' petition is whether the original contract provided insurance for medical and hospital expenses for an injury or illness occurring during the life of the policy or for the payment of the cost of such services incurred during the policy period. The language of the certificates issued to plaintiffs clearly shows the receipt of the services and the incurring of the expenses to be the contingency insured against.

"At the outset, we note that defendants are not technically insurers, they are not-for-profit health service corporations as defined by section 354.010.4, RSMo 1978, providing pre-paid hospital care and medical services or reimbursement therefor. Notwithstanding, their contracts with subscribers are to be construed in the same manner as insurance policies issued by commercial insurers. *North Kansas City Memorial Hospital v. Wiley,* 385 S.W.2d 218, 223 (Mo.App.1964).

The rules of construction applicable to insurance contracts require that the language used be given its plain meaning. *Madison Block Pharmacy, Inc. v. United States Fidelity & Guarantee Co.,* 620 S.W.2d 343, 346 (Mo. banc 1981); *Moskowitz v. Equitable Life Assur. Soc. of the United States,* 544 S.W.2d 13, 20 (Mo. banc 1976). If the language is unambiguous the policy must be enforced according to such language. *Moskowitz,* 544 S.W.2d at 20; *State Farm Mutual Automobile Co. v. Thomas,* 549 S.W.2d 616, 618 (Mo.App.1977). If the language is ambiguous it will be construed against the insurer. *Meyer Jewelry Co. v. General Insurance Co. of America,* 422 S.W.2d 617, 623 (Mo.1968). Language is ambiguous if it is reasonably open to different constructions; and language used will be viewed in light of "the meaning that would ordinarily be understood by the layman who bought and paid for the policy." *Stafford v. Travelers Ins. Co.,* 530 S.W.2d 23, 25 (Mo.App.1975). *Robin v. Blue Cross Hospital Service, Inc.,* 637 S.W.2d 695, 698 (Mo. banc 1982).

"The pertinent provisions of the three certificates which comprise the "Com-Pac" program provide:

The membership benefits shall, in any case, be the ones for which dues are being charged and remitted at the time hospital care is provided hereunder.

. . . .

Cancellation or termination of this agreement for any reason will automatically terminate the rights and privileges herein specified for all participants EXCEPT ... (a conversion privilege for surviving dependents of a deceased member).

. . . .

The provisions hereunder apply only to expenses incurred while the Participant is covered hereunder. An expense or charge shall be deemed incurred as of the date the service is rendered or purchase is made from which the expense or charge arises.

No other provisions of the certificates are inconsistent with those set out above. The entire tenor of the language used relates to the receipt of medical and hospital care and the incurring of expenses therefor. No mention or reference is made to the date

upon which illness commences or injury is sustained. Plaintiffs, in their petition, accurately describe the contract as "a certain medical expense plan, ..."

"The decision of the Missouri Supreme Court in *Robin v. Blue Cross Hospital Service, Inc., supra,* is determinative here. In *Robin,* a plaintiff's accidental injuries resulted in her loss of employment and coincidental termination of her membership in a group hospital service plan. She sued for reimbursement for the cost of medical care necessitated by her accidental injury but incurred after such termination. The Supreme Court held the language of the contract "clearly provides that the right to benefits for medical services does not extend beyond the life of the contract." 637 S.W.2d 699.

"*Robin* differs from the instant case in that in *Robin* the plaintiff of her own volition failed to keep the agreement in force by exercising her privilege of conversion to individual coverage after termination of her group coverage. Here, plaintiffs had no such opportunity as the contract expressly denies any conversion rights when the coverage is terminated by reason of replacement by a new program. The difference is irrelevant, however, as the unambiguous terms of the contract provide only for liability for expenses when incurred, not for any vesting of rights as of the inception of an illness or injury.

"Other jurisdictions have reached the same result as *Robin* unless the language of the contract was such as to permit the conclusion that inception of a disease rather than the incurring of medical expense was the insurable event. *See Annot. Elimination of Particular Coverage, or Termination of Health, Hospitalization, or Medical Care Insurance Policy as Affecting Insurer's Liability for Insured's Continuing Hospitalization or Medical Expenses Relating to Previously Covered Illness,* 66 A.L.R.3d 1205. The precise wording of the policy in describing the risk insured against is the determinative factor, and the reason for the termination of the coverage is irrelevant. *Id.* at 1208. Thus, in *Blue Cross of Florida, Inc. v. Dysart,* 340 So.2d 970 (Fla.App.1976), the replacement by plaintiff's employer of medical expense coverage by a different health and accident policy was held to terminate the original insurer's liability to the employee for subsequently incurred medical and hospital expenses caused by an injury sustained during the policy period. *Accord: Tabb v. Louisiana Health Services and Indemnity Company,* 352 So.2d 771 (La. App.1977), *rev'd on other grounds,* 361 So.2d 862 (La.1978); *Wulffenstein v. Deseret Mutual Benefit Association,* 611 P.2d 360 (Utah 1980); *Northwestern National Life Insurance Co. v. Glenn,* 568 S.W.2d 693 (Tex.App.1978); *St. Paul Fire & Marine Insurance Co. v. Purdy,* 129 Ga.App. 356, 199 S.E.2d 567 (Ga.App.1973); *Cohen v. Northwestern National Life Insurance Co.,* 124 Ill.App.2d 15, 259 N.E.2d 865 (1970); *Bartulis v. Metropolitan Life Insurance Co.,* 72 Ill.App.2d 267, 218 N.E.2d 225 (1966).

"Plaintiffs urge us to find an ambiguity in the contract because there is no provision therein "limiting benefits payable for the care of mental illness, nor any specific provision pertaining to the vesting of the right to receive benefits or the termination of benefits which have vested under the contract...." The failure to exclude or limit benefits for the care of mental illness does not create an ambiguity. Such care received during the life of the contract is covered and has been furnished by defendants. The contract provides for the vesting of the right to benefits "at the time hospital care is provided...." and to expenses "incurred while participant is covered hereunder." An expense is incurred "as of the date the service is rendered or purchase is made...." We find no ambiguity in such language nor does the absence from the contract of any provision regarding the effect upon vested rights of termination of the contract create a relevant ambiguity. That liability incurred prior to termination

cannot be extinguished without consent of the insured is written into the agreement as a matter of law and public policy. But that has no relevance here as all expenses incurred prior to termination of the contract have admittedly been paid by the defendants.

"Finally, plaintiffs contend the contract provisions are ambiguous when read in the light of the advertising brochure regarding "lifetime benefits" and the contract provision that "hospital care, subject to all other provisions of this certificate, shall continue only while the participant is under the treatment or care of his physician and shall end when such participant is discharged as a hospital patient by the attending physician."

"The brochure is not part of the contract sued upon. The statements contained therein form the basis for Count II of plaintiffs' petition seeking damages for false advertising in violation of the unlawful merchandising practices statute, § 407.-010, et seq., RSMo 1978. Plaintiffs have not appealed from a dismissal of this count by the trial court.

"The contractual provision regarding continued hospital care until discharge by a physician is qualified by the phrase "subject to all other provisions of this certificate." Other provisions clearly state that termination of the contract results from the act of the group sponsor in making available another program of hospital care and that termination of the agreement for any reason automatically terminates the right to benefits.

"The gist of plaintiffs' argument is that the combination of the advertising and the continued care provision of the contract gave them "reasonable expectations" of the vesting of their right to benefits despite the clear language of the policy. This approach was adopted in *Danzig v. Dikman,* 78 A.D.2d 303, 434 N.Y.S.2d 217 (App.Div.1980) and *Myers v. Kitsap Physicians Service,* 78 Wash.2d 286, 474 P.2d 109 (Wash. banc 1970), the cases principally relied upon by plaintiffs. However, the reasonable expectation rule of construction was expressly rejected by the Supreme Court of Missouri in cases involving group sponsorship of a health care program in *Robin v. Blue Cross Hospital Service, Inc., supra.* We are constrained to follow this decision.

While we recognize the apparent harshness of the result we must reach herein, we are not at liberty to rewrite the provisions of the contract the parties have entered into. The trial court, in addition to discussing an unspecified ambiguity, expressed its reliance upon equitable maxims. Although at times it may appear regrettable, our system of jurisprudence does not permit the luxury of disregarding established principles which, over the years, have demonstrated their value.

A court of equity, no more than a court of law may act upon its own conceptions of what is right in a particular case, for established rules and precedents are equally binding upon both law and equity courts; and where the rights of parties litigant are clearly defined by statutes, legal principles and precedents, those statutes and legal principles may not be unsettled or ignored. And not even a court of equity has any discretion as to what the law may be.

*Milgramm v. Jiffy Equipment Co.,* 362 Mo. 1194, 247 S.W.2d 668, 676 (1952).

"The Rule of Law, based upon time proven principles, creates and maintains the stability essential to the orderly and tranquil regulation of all societal relationships. Such stability cannot survive judicial decisions which depart from precedent in favor of individual concepts of what is equitable.

"Accordingly, the trial court's entry of summary judgment in favor of plaintiffs on Count I is reversed. Defendants did not appeal from the overruling of their motion to dismiss Count I of plaintiffs' petition. Therefore, the cause is remanded to the trial court for further proceedings not inconsistent with this opinion."