In the
 Missouri Court of Appeals
 Western District

 
 MICHAEL EIVINS, 
 
 Appellant,  WD84321
 v.  OPINION FILED:
 
 MISSOURI DEPARTMENT OF  OCTOBER 26, 2021
 CORRECTIONS, 
 
 Respondent. 
 

 Appeal from the Circuit Court of Buchanan County, Missouri
 The Honorable Daniel F. Kellogg, Judge

 Before Division Two: Mark D. Pfeiffer, Presiding Judge, Alok Ahuja, Judge,
 Anthony Rex Gabbert, Judge

 Michael Eivins appeals the circuit court’s Judgment granting the Missouri Department of

Corrections’ (DOC) motion for summary judgment on all counts in Eivins’s “Petition for

Damages” which alleged age discrimination in violation of the Missouri Human Rights Act

(MHRA), retaliation in violation of the MHRA, and hostile work environment in violation of the

MHRA. Eivins asserts on appeal that the circuit court, 1) erred in applying the motivating factor

standard to Eivins’s claims, arguing that the contributing factor standard applies to the State and

State agencies, 2) erred in granting summary judgment to the DOC on Eivins’s age discrimination

claim, arguing that genuine issues of material fact exist as to whether Eivins’s age was a
contributing or motivating factor in the alleged discriminatory actions taken against him, 3) erred

in granting summary judgment to the DOC on Eivins’s hostile work environment claim, arguing

that the trial court improperly disregarded tangible employment actions that are legally sufficient

to support a hostile work environment claim, evaluated each paragraph of Eivins’s petition

individually and failed to consider the totality of the circumstances, disregarded uncontroverted

evidence of a hostile work environment, and improperly ignored events a jury could have

considered as background evidence when determining if Eivins’s work environment was abusive,

and 4) erred in granting summary judgment to the DOC on Eivins’s retaliation claim, arguing that

genuine issues of material fact exist regarding this claim and the court failed to consider Eivins’s

evidence of retaliation while improperly giving the DOC the benefit of inferences from the

evidence. We affirm in part and reverse in part.

 Background and Procedural Information

 On April 6, 2020, Michael Eivins filed a Second Amended Petition for Damages alleging

in Count I, age discrimination in violation of the MHRA, in Count II, retaliation in violation of the

MHRA, and in Count III, hostile work environment in violation of the MHRA.

 Eivins began working for the DOC in or around 2001, and was fifty years old at the time

he filed his petition. Eivins left the employment of the DOC in 2014, and from 2014 to 2017, he

worked at the Leavenworth Detention Center.1 In July, 2017, Eivins was rehired by the DOC and

began working at the Western Missouri Correctional Center (WMCC) in Cameron, Missouri.

 1
 Many of the factual allegations set forth in Eivins’s petition regard time periods the court found barred by
the statute of limitations. Eivins does not contest the court’s finding in this regard. The facts set forth herein focus,
therefore, on allegations that are not time-barred.

 2
 In June 2018, WMCC held interviews to fill three open positions. In August 2018, WMCC

filled a fourth open position using the June 2018 interviews. Eivins applied for these positions,

was interviewed, and was rejected for promotion. Eivins alleges that he had a higher “merit score”

than all other applicants, and that all applicants promoted were younger than thirty-five years of

age. He alleges that two of the three people promoted had completed the training academy only

one month prior to their promotions. He alleges that, although Stacy Yarbrough was promoted in

August over Eivins, the interview committee recommended after the June interviews that

Yarbrough not be promoted and later changed its interview notes to justify her promotion. Based

on the changed recommendation, Eivins, age forty-nine at the time, was not promoted, while

Yarbrough, age twenty-five, was promoted. Eivins alleges that, this was despite Eivins having a

merit score of 87, an interview score of 70, fourteen years’ experience with the DOC, and a positive

recommendation from his supervisor. Yarbrough had a merit score of 70, an interview score of 60,

only eighteen months experience with the DOC, and Yarbrough’s supervisor stated that she “lacks

experience.”

 In June 2018, Crossroads Correctional Center (Crossroads), a DOC facility that neighbors

WMCC, held separate interviews to fill five open positions at that facility. Five individuals were

interviewed, and only two were promoted. Eivins applied for these positions, was interviewed,

and was rejected for promotion. Eivins had higher merit scores than both of the promoted

individuals, whom Eivins knew to be younger than thirty-five years of age.

 Eivins alleges that he was placed on a “Performance Plan” in September 2018 to deter him

from applying for additional, upcoming positions.

 Eivins filed his first Charge of Discrimination in October 2018, which the DOC began

investigating in April 2019. He alleges that, after he filed his first Charge of Discrimination, he

 3
was constantly nitpicked2 and was falsely accused of drinking on the job. He alleges that the

repeated failures to promote, deterring him from applying for other promotions, being constantly

nitpicked, and being falsely accused of drinking on the job affected Eivins physically and mentally,

including causing him to lose sleep. This, he contends, led him to submit his resignation in April

2019.

 The DOC moved for summary Judgment on August 26, 2020. The DOC argued that its

non-discriminatory reason and motivating factor for promoting younger employees over Eivins

was that Eivins did not perform well during the interviews compared to the other candidates. In

the WMCC interview, he allegedly did not show a working knowledge of policy and procedure,

and left some of the paperwork he was required to bring to the interview in his car. In the

Crossroads interview, he seemed unsure of himself and, instead of giving direct answers, told

stories. Further, he stated that he had lost documents from the interview packet which showed a

lack of preparedness. The DOC argued, therefore, that it was entitled to judgment as a matter of

law on Eivins’s age discrimination claim.

 With regard to Eivins’s retaliation claim, the DOC argued that Eivins’s first complaint of

discrimination was made in October 2018, and the only allegation Eivins made with regard to his

treatment by the DOC after this date was his allegation that he was falsely accused of drinking on

the job. The DOC argued that the facts showed that Eivins agreed that he suffered no adverse

treatment based on that allegation, in that he was not required to take a breathalyzer, only spoke to

 2
 Both the DOC’s and Eivins’s statements of fact use the term “nitpicked.” In Eivins’s deposition, which is
referenced by the parties in their statements of fact, Eivins testified that Lieutenant Jill Richards “was nitpicking
everything I would do, how I would do my job, how effectively I would do my rounds in the facility, how I would be
watching my officer who was walking in the wings keeping my eye on him or her for their safety and my safety.”
Although we could describe “nitpicked” and “nitpicking” with more formal terms in this Opinion, so as to not
inadvertently attach a meaning to these terms not intended by the parties, we discuss these words herein as they have
been labeled by the parties.

 4
two individuals about the allegation, and was not disciplined, demoted, or written up in response

to the allegation. Further, Eivins admitted that if a co-worker suspects that a fellow employee is

drinking on the job, the co-worker has a duty to report the suspicion. The DOC argued that for

this same reason, Eivins’s allegation that he was constructively terminated fails because the only

allegation he made that could be considered to have resulted in the constructive termination is the

accusation of drinking at work, and that resulted in no negative treatment toward Eivins. The DOC

argued that it also sufficiently investigated Eivins’s complaints and conducted a complete

investigation.

 The DOC contended that it was entitled to summary judgment as a matter of law on

Eivins’s hostile work environment claim, arguing that the only allegations from Eivins’s Second

Amended Petition that could “theoretically constitute his hostile work environment claim are those

surrounding Eivins’s performance plan.” The DOC contended that the record showed that Eivins

was placed on the performance plan in September 2018 for absences occurring in the earlier half

of 2018. Consequently, Eivins was already on the performance plan at the time of his October

2018 surgery, and the surgery, therefore, could not have been the impetus for his performance plan.

The DOC argued that Eivins, therefore, could not show that he was put on a performance plan for

a discriminatory or retaliatory reason, or to create a hostile work environment.

 On February 9, 2021, the circuit court found no genuine issue existing as to any material

fact to support Eivins’s claims of age discrimination, retaliation, or hostile work environment, and

concluded the DOC was entitled to judgment as a matter of law on all of Eivins’s claims.

 This appeal follows. Additional factual history will be discussed below as necessary to

address Eivins’s points on appeal.

 5
 Standard of Review

 The standard of review for a preserved appeal challenging the grant of a motion for

summary judgment is de novo. ITT Com. Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d

371, 376 (Mo. banc 1993). In such cases, we do not defer to the trial court’s decision, but instead

use the same criteria that the trial court should have employed in initially deciding whether to grant

the motion. Barekman v. City of Republic, 232 S.W.3d 675, 677 (Mo. App. 2007) (internal citations

omitted). We review the record in the light most favorable to the party against whom judgment

was entered, and accord that party the benefit of all inferences which may reasonably be drawn

from the record. Id. Summary judgment is appropriate where the moving party has demonstrated,

on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law.

ITT Com. Fin. Corp., 854 S.W.2d at 376. A genuine issue that will prevent summary judgment

exists where the record shows two plausible, but contradictory, accounts of the essential facts and

the genuine issue is real, not merely argumentative, imaginary, or frivolous. Id. at 382. “Facts set

forth by affidavit or otherwise in support of a party’s motion are taken as true unless contradicted

by the non-moving party’s response to the summary judgment motion.” Id. at 376. The moving

party bears the burden of establishing a legal right to judgment and the absence of any genuine

issue of material fact required to support the claimed right to judgment.” Id. at 378.

 A ‘defending party’ may establish a right to summary judgment by showing: (1)
 facts negating any one of the claimant’s elements; (2) that the party opposing the
 motion has presented insufficient evidence to allow the finding of the existence of
 any one of the claimant’s elements; or (3) that there is no genuine dispute as to the
 existence of each of the facts necessary to support a properly pleaded affirmative
 defense.

Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc., 155 S.W.3d 50, 58-59 (Mo. banc 2005).

“Summary judgment should seldom be used in employment discrimination cases, because such

 6
cases are inherently fact-based and often depend on inferences rather than on direct evidence.”

Hill v. Ford Motor Co., 277 S.W.3d 659, 664 (Mo. App. 2009).

 Point I – Motivating Factor Standard vs. Contributing Factor Standard

 In Eivins’s first point on appeal, he contends the circuit court erred in applying the

motivating factor standard to his MHRA claims, arguing that the contributing factor standard

applies pursuant to Section 213.070.3 He contends that Section 213.070 applies to the State and

State agencies, and Section 213.070 does not require application of the motivating factor standard.

 Eivins argues that the legislature made “sweeping revisions” to Section 213.055.1(1) of the

MHRA in 2017. Section 213.055.1(1)4 makes it unlawful for an employer to discriminate

“because of the race, color, religion, national origin, sex, ancestry, age or disability of any

individual.” (Emphasis added). Courts had previously interpreted “because of,” which was not

statutorily defined in the MHRA, to mean that protected status must be a “contributing factor” in

an adverse employment action to warrant relief under the MHRA. Daugherty v. City of Maryland

Heights, 231 S.W.3d 814, 820 (Mo. banc 2007); Cox v. Kansas City Chiefs Football Club, Inc.,

473 S.W.3d 107, 115 (Mo. banc 2015). The 2017 legislative amendments defined “because of” to

 3
 All statutory references are to the Revised Statutes of Missouri, as updated through 2018, unless otherwise
noted.
 4
 Section 213.055.1(1) states, in relevant part:

 1. It shall be an unlawful employment practice:

 (1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or
 disability of any individual:

 (a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate
 against any individual with respect to his compensation, terms, conditions, or
 privileges of employment, because of such individual’s race, color, religion, national
 origin, sex, ancestry, age or disability …

 7
mean, “as it relates to the adverse decision or action, the protected criterion was the motivating

factor.” § 213.010(2). “Motivating factor” is now defined to mean “the employee’s protected

classification actually played a role in the adverse action or decision and had a determinative

influence on the adverse decision or action.” § 213.010(19).

 Eivins argues that the statute applicable to Eivins’s claims against the DOC is Section

213.070, because it applies to the State and its political subdivisions. Eivins argues that since

Section 213.070 does not include the “because of” language found in Section 213.055 and defined

in Section 213.010(2), the contributing factor standard, and not the motivating factor standard,

applies to his claims. We disagree.

 In 2007, the Missouri Supreme Court determined in Daugherty v. City of Maryland Heights

that the “contributing factor” standard was to be used when analyzing summary judgment

decisions pursuant to the MHRA, holding that a discrimination claim could survive summary

judgment if there is a genuine issue of material fact as to whether the protected classification (age

and disability in that case) was a “contributing factor” in the adverse employment action. 231

S.W.3d 814, 820 (Mo. banc 2007). The City of Maryland Heights was the defendant in that case,

and cities are political subdivisions of the State. City of Crestwood v. Affton Fire Protection Dist.,

620 S.W.3d 618, 630 n.9 (Mo. banc 2021) (citing Mo. Const. art. X, sec. 15).

 In 2017, the Missouri legislature expressly abrogated Daugherty stating:

 The general assembly hereby expressly abrogates by this statute the cases of
 Daugherty v. City of Maryland Heights, 231 S.W.3d 814 (Mo. 2007) and its progeny
 as they relate to the contributing factor standard and abandonment of the burden-
 shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S.
 792 (1973).

§ 213.101.4 As the City of Maryland Heights is a political subdivision of the State, and the

legislature expressly abrogated use of the contributing factor standard in such cases, the

 8
contributing factor standard is similarly inapplicable to a case brought pursuant to Section

213.070.1(3), which makes it an unlawful discriminatory practice for “the state or any political

subdivision of this state to discriminate on the basis of race, color, religion, national origin, sex,

ancestry, age, as it relates to employment, disability, or familial status as it relates to housing[.]”

Eivins’s argument that the contributing factor standard was preserved, and not abrogated, in cases

against the State and its political subdivisions is directly contrary to the legislative intent evident

in the abrogation of Daugherty.5

 Daugherty was brought pursuant to Section 213.055, as was Eivins’s case,6 and Eivins

provides this court with no support for his present claim that Section 213.055 has now been

replaced by Section 213.070 for his claims. Nevertheless, both Section 213.055 and Section

213.070 are applicable to “employers.” Eivins alleges in his petition that, at all relevant times,

“Defendant was Plaintiff’s employer as defined by, and within the meaning of, the Missouri

Human Rights Act (MHRA), Mo. Rev. Stat. §213.010(7).” “Employer” is defined under Section

213.010 as, among other things, including “the state, or any political or civil subdivision thereof.”

§ 213.010(8).

 5
 Section 213.101.1 states that, “The provisions of this chapter shall be construed to accomplish the purposes
thereof and any law inconsistent with any provision of this chapter shall not apply.”
 6
 Despite arguing that Section 213.070 applies to his claims, Eivins does not cite Section 213.070 in his
Second Amended Petition for Damages. In his claim of age discrimination, he states that, “Defendant’s actions and/or
inactions all alleged herein constitute unlawful employment discrimination against Plaintiff in violation of the MHRA,
Mo. Rev. Stat. §213.055”; in his claim of illegal retaliation he states that, “All Defendant’s actions and/or inactions
constitute unlawful retaliation against Plaintiff in violation of the MHRA, MO. REV. STAT. §213.055”; and in his
claim of hostile work environment, he states that, “Defendant’s actions and/or inactions constitute unlawful
employment discrimination against Plaintiff in violation of the MHRA, MO. REV. STAT. §213.055. He also alleges
that, at all relevant times, “Defendant was Plaintiff’s employer as defined by, and within the meaning of, the Missouri
Human Rights Act (MHRA), Mo. Rev. Stat. §213.010(7).” “Employer” is defined under Section 213.010 as, among
other things, including “the state, or any political or civil subdivision thereof.” § 213.010(8).

 9
 Eivins brought his claims pursuant to Section 213.055. Section 213.055 clearly applies to

the State, and the motivating factor standard applies to Eivins’s claims. The circuit court, therefore,

did not err in applying the motivating factor standard to Eivins’s MHRA claims against the DOC.

 Eivins’s first point on appeal is denied.

 Point II – Summary Judgment as to Age Discrimination

 In his second point on appeal, Eivins contends that the circuit court erred in granting the

DOC summary judgment as to his claim for age discrimination in violation of the MHRA, arguing

that genuine issues of material fact exist regarding whether Eivins’s age was a motivating factor

in the discriminatory actions taken against him. Eivins argues that the record contains two

plausible, but contradictory accounts of essential facts regarding discriminatory intent and pretext.

 Section 213.055.1(1)(a) prohibits discrimination based on age. Section 213.010(1) defines

“age” for purposes of the MHRA as forty or more years old but less than seventy. Eivins was

forty-nine at the time of the alleged discrimination. To establish an age discrimination claim under

the MHRA, an employee must show: (1) that he suffered an adverse employment action; (2) that

his age was the motivating factor; and (3) that he suffered damage as a result. Clark v. AT&T

Mobility Services, L.L.C., 623 S.W.3d 197, 206 (Mo. App. 2021); § 213.010(2). Section

213.010(19) defines “the motivating factor” as: “the employee’s protected classification actually

played a role in the adverse action or decision and had a determinative influence on the adverse

decision or action.”

 “Like federal courts, Missouri courts use the burden-shifting analysis developed in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to

evaluate proof in discrimination cases where disparate treatment is alleged.” Vermett v. State, 544

S.W.3d 294, 299 (Mo. App. 2018); § 213.101.3,4. The Missouri legislature has declared that this

 10
format is to be considered highly persuasive for summary judgment analysis in cases not involving

direct evidence of discrimination. § 213.101.3. Under this framework, a plaintiff establishes a

prima facie case of discrimination in a failure-to-promote case by showing that: (1) the plaintiff is

a member of a protected group; (2) the plaintiff qualified and applied for a promotion to an

available position; (3) the plaintiff was rejected; and (4) similarly situated employees, not part of

the protected group, were promoted instead. Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 650

(8th Cir. 2001). If established, “the burden of production then shifts to the employer, who must

rebut the presumption of discrimination with evidence that the plaintiff was rejected, or someone

else was preferred, for a legitimate, nondiscriminatory reason.” Id. (internal quotation marks and

citation omitted). If a legitimate, nondiscriminatory reason is established by the employer, the

“burden then reverts to the plaintiff to point to evidence which, if believed, would expose the

employer’s reason as a mere pretext for intentional discrimination.” Id.

 In the McDonnell Douglas case, a civil rights activist engaged in disruptive and illegal

activity against his employer to protest that his discharge as an employee and the company’s

general hiring practices were racially motivated. 411 U.S. at 792. When the employer later

advertised for qualified personnel and then rejected the employee’s re-employment application,

the employee sued the employer alleging civil rights violations. Id. The Plaintiff argued that he

was denied employment because of his involvement in civil rights activities and because of his

race and color. Id. at 801. The employer denied discrimination of any kind, asserting that its

failure to re-employ him was based upon, and justified by, the employee’s participation in unlawful

conduct against the employer. Id. The majority in the Court of Appeals decision suggested that

the employer’s stated reason for refusing to rehire represented “subjective” rather than “objective”

criteria, which the Court considered to carry little weight in rebutting charges of discrimination.

 11
Id. at 803. The United States Supreme Court disagreed and found that the employer’s position

was actually entitled to great weight because it was undisputed that the employee took part in a

carefully planned “stall-in,” designed to tie up access to and egress from the employer’s plant at a

peak traffic hour. Id. The Court found that nothing in Title VII compels an employer to rehire

someone who has engaged in deliberate, unlawful activity against it. Id. As such, the Court found

that the employer’s explanation for rejection established a showing of a legitimate,

nondiscriminatory reason for its decision. Id. at 804. The Court held that, nevertheless, the

employee must have an opportunity to show that the employer’s stated reason for rejecting the

employee was, in fact, pretext. Id.

 DOC’s Alleged Legitimate, Nondiscriminatory Actions in Failing to Promote

 Here, the DOC concedes that Eivins has made an initial, prima facie showing of failure to

promote. Applying McDonnell Douglas and Rule 74.04 to the case before us, the DOC must then

“demonstrate” with pleadings, discovery, exhibits or affidavits that there is no genuine issue as to

whether its reasons for not promoting Eivins were nondiscriminatory before Eivins is required to

present evidence of pretext.7 We first consider, therefore, whether the DOC made a prima facie

showing, through its evidence, of legitimate, nondiscriminatory reasons for promoting younger

applicants over Eivins and placing Eivins on a performance plan.

 7
 Had McDonnell Douglas been in the context of summary judgment, it could fairly be said that the
employee’s disruptive and illegal conduct toward the employer was an undisputed fact, and in so being the employer
presented a legitimate, nondiscriminatory reason for refusing to rehire the plaintiff, which then required the employee
to rebut the showing with evidence of pretext.

 12
 WMCC Promotions

 The DOC bases their motion for summary judgment largely on the claim that Eivins did

not give as good of interviews as the candidates promoted over Eivins. (DSOF #25).8 Specifically,

the DOC claims that, with regard to the WMCC interview, Eivins “did not have all of the

paperwork that he was required to bring at the time of his interview, as the paperwork was left in

his car.” (DSOF #21). Further, Eivins was “unable to demonstrate a working knowledge of policy

and procedure.” (DSOF #22). This was partially due to “Eivins’s lack of experience with day-to-

day tasks on day shift.” (DSOF #23). The day following the interview, Interviewer Pierce advised

Eivins that he should consider moving to the day shift, believing that Eivins would benefit from

experience on other shifts. (DSOF #26, #27). Eivins’s WMCC interview was rated as “adequate.”

(DSOF #24). Because Eivins did not observe the interviews of the other candidates, he cannot

dispute that the other candidates had superior interviews. (DSOF #19, #20).

 The evidence supplied to support these claims includes Eivins’s deposition, an affidavit by

interviewer Jerry Pierce which cites an attached June 7, 2018, post-interview “Board

Recommendation” letter (WMCC Recommendation Letter), and an affidavit by interviewer Mike

Penland which attaches and cites the same WMCC Recommendation Letter. This WMCC

Recommendation Letter, and the Crossroads Recommendation Letter discussed below, are

significant because they discuss the criteria considered with regard to each candidate, and it has

been held that a submissible case of discriminatory failure to promote can be made with, among

other things, evidence that the employer’s purported reason for failing to promote was not an

original qualification for the position, the plaintiff met many of the qualifications for the position,

 8
 The DOC’s “Uncontroverted Material Facts” will be identified herein as “DSOF,” and Eivins’s
“Uncontroverted Material Facts” will be identified as “PSOF.”

 13
and the chosen candidate was not as qualified for the position as the employer had suggested. See

McGaughy v. Laclede Gas Company, 604 S.W.3d 730, 747-748 (Mo. App. 2020).

 Upon review of the DOC’s evidence, we find that a candidate’s provision of required

documentation at the time of the interview was a consideration given in most all applicant

interviews, as the WMCC Recommendation Letter makes note of this for seven of the eight

candidates interviewed. This criterion could, therefore, represent a nondiscriminatory justification

for promoting other candidates over Eivins.

 With regard to a candidate having a “working knowledge of policy and procedure,” the

DOC’s evidence does not conclusively demonstrate the extent to which this consideration was

given to all candidates. The notation regarding Eivins does not explain what it meant by “working”

knowledge, and gives no examples as to policy and procedures Eivins was unable to “demonstrate”

or articulate. The WMCC Recommendation Letter makes no mention at all of the “working

knowledge of policy and procedure” that three of the recommended candidates (two selected and

one alternate) possessed.

 However, while not expressly using the terms “working knowledge of policy and

procedure,” the top recommended candidate was noted as being “able to clearly explain how to

properly conduct a Code 23”; the second recommended candidate was noted to be “able to explain

the proper procedure for conducting a Code 23 and how to handle a situation with an Offender

with unexplained injuries”; the third recommended candidate was “able to explain the proper

procedures for conducting a Code 23 and what to do in the event an Offender has unexplained

injuries,” and the alternate was “able to explain how to handle a Code 23, an Offender with

unexplained injuries and how to address a situation with an insubordinate staff member.” It is

possible that these examples are what the DOC considers “working knowledge of policy and

 14
procedure,” but it is impossible to know this for sure just based on the WMCC Recommendation

Letter. If these are examples of what the DOC deems working knowledge of policy and procedure,

the WMCC Recommendation Letter raises a question of fact as to at what point the DOC deems a

candidate to lack a working knowledge of policy and procedure such as to impair promotion. The

alternate candidate (Shenea Gardner) correctly responded to three different fact scenarios, the

second and third chosen candidates (Dylan Montague and Nathen Gilmore, respectively) correctly

provided answers to two scenarios, and the top candidate (Miles Baldwin) just one. Although the

top candidate was expressly noted as having “showed knowledge of using corrective steps when

dealing with Departmental Policy and Procedures,” it is unknown if this was “working” knowledge

as Eivins was cited for failing to demonstrate.

 Similarly, the WMCC Recommendation Letter does not show that Stacy Yarbrough (later

selected to fill an open position based on this interview) demonstrated a “working knowledge of

policy and procedure” where she had an “understanding of Departmental Policy and Procedures”

but needed “guidance from a supervisor to complete the documentation.” Further, she was only

able to “somewhat outline the steps for a Code 23 and how to deal with an offender with

unexplained injuries.” She was also only “somewhat knowledgeable of how to deal with an

allegation of sexual harassment between two staff members.” Yarbrough’s supervisor reported

that “she needs more knowledge and experience to make more appropriate policy and procedure-

based decisions.”

 The exact same position (Corrections Officer II) was being filled at the Crossroads facility.

In the June 8, 2018, Crossroads’ interview panel’s recommendation letter (Crossroads

Recommendation Letter), a working knowledge of policy and procedure was not mentioned at all

as a considered criterion.

 15
 Moreover, the DOC’s own evidence to support that Eivins was “unable to demonstrate a

working knowledge of policy and procedure” as justification for failing to promote Eivins does

not unquestionably support this was a legitimate, nondiscriminatory reason for promoting younger

candidates over Eivins.

 The DOC elaborates that Eivins’s lack of knowledge of policy and procedure was partially

due to “Eivins’s lack of experience with day-to-day tasks on day shift.” Jerry Pierce states in his

affidavit that, when he is looking to promote an individual, he considers “experience such as

whether they have experience from multiple shifts or just one shift.” He attests that, after Eivins

was not selected for promotion he advised Eivins that he should “try to bid on the day shift,”

because he believed there was more to learn on the day shift that is not possible to learn on the

first shift.

 The WMCC Recommendation Letter states only that, “It was the decision of the committee

that COI Michael Eivins needs more experience and is not being recommended for Promotion to

COII at this time.” Pierce’s affidavit, in which he explains what was purportedly meant by “needs

more experience,” was created two years after the interview and after Eivins filed his complaints

of discrimination. Significantly, nowhere in the WMCC Recommendation Letter (or the

Crossroads Recommendation Letter) is experience on varied shifts mentioned with regard to any

candidate. Although Yarbrough was promoted over Eivins, the WMCC Recommendation Letter

states that, “It was the decision of the committee that COI Yarbrough needs more experience and

 16
is not being recommended for Promotion to COII at this time.”9 The DOC’s claim that Eivins’s

lack of experience on the day shift was a legitimate, nondiscriminatory justification for the DOC

promoting other candidates simply cannot be supported by evidence that does not reflect that day

shift experience and/or experience on a variety of shifts was a criterion considered with regard to

candidates promoted over Eivins.

 The DOC also contends that Eivins generally did not give as good of an interview as the

other candidates, with his interview rated as “adequate.” We find that this alleged

nondiscriminatory reason is not conclusively supported by the DOC’s evidence because the

WMCC Recommendation Letter shows that Yarbrough’s interview was also rated “adequate,” yet

she was promoted. Among other things, the WMCC Letter states that Yarbrough “gave vague

answers during the interview and was unable to adequately show the responsibilities and/or the

knowledge of a Sergeant position.” Although the DOC contends that, because Eivins did not

observe the other candidate’s interviews, he cannot know how his interview rated in comparison,

we find this irrelevant to whether the DOC supplied evidence, in support of its motion for summary

judgment, that unquestionably shows legitimate, nondiscriminatory reasons for choosing other

candidates over Eivins.

 9
 Shenea Gardner worked for the DOC approximately sixteen months at the time she was recommended for
promotion, and Yarbrough eighteen to nineteen. A reasonable inference can be drawn from this evidence that neither
could have accrued a significant amount of time on varied shifts. The August 6, 2018, letter recommending
Yarbrough’s promotion states that Yarbrough had worked “on 3 rd shift for the vast majority” of her employment with
the DOC. We are unable to say based on this record if the DOC implements a traditional number system with regard
to shifts, but the “3rd shift” in other settings traditionally runs during the overnight hours of midnight to 8 a.m.

 The June 8, 2018, letter written by Eivins’s supervisor to Penland to recommend Eivins for promotion states
that “Eivins is currently assigned to 1st shift Food Service with Saturday/Sunday RDO’s.” It further states that “COI
Eivins also works a significant amount of overtime on third shift; usually working four or more hours daily in addition
to working many of his weekends.”

 17
 Crossroads Promotions

 With regard to the Crossroads interview, the DOC contends that its nondiscriminatory

reason for promoting younger applicants over Eivins is that Eivins “did not bring a complete

interview packet to the interview” and “stated that he had lost the documents.” (DSOF #32). “Not

coming prepared to the interview did not reflect well on Eivins’s preparedness to promote to

Sergeant.” (DSOF #33). “When answering questions, Eivins seemed unsure of himself.” (DSOF

#34). “Instead of giving direct answers, Eivins told stories.” (DSOF #35). Ultimately, “[t]he

interview committee determined that Eivins was not ready to promote and promoted other

candidates, based on the interviews.” (DSOF #36). Eivins did not observe the interviews for the

other candidates, so has no personal knowledge of how he did in comparison to the other

candidates. (DSOF #19, #20).

 The evidence supplied by the DOC to support these claims includes Eivins’s deposition,

and an affidavit by interviewer Christopher Shaw which attached the Crossroads Recommendation

Letter which Shaw referenced in support of his affidavit.

 Upon reviewing the DOC’s evidence, we find that, as with the WMCC promotions,

Eivins’s failure to bring required paperwork to the interview could be perceived as a legitimate,

nondiscriminatory criterion for failing to promote Eivins; this criterion was discussed with regard

to each candidate in the Crossroads Recommendation Letter.

 The interviewers’ subjective assessment that Eivins seemed unsure of himself, and failed

to directly answer the interview questions, may in certain circumstances justify an adverse

employment action. In this case, however, as explained more fully below, Eivins presented

evidence that his merit score was equal to, or significantly higher than, the candidates DOC

ultimately selected for promotion. Eivins also directly disputed the interviewers’ characterization

 18
of his Crossroads interview, contending on the contrary that he had been confident, and exhibited

knowledge directly responsive to the interviewers’ questions.

 Performance Plan

 With regard to Eivins being placed on a performance plan (which Eivins contends was

implemented to prevent him from applying for an upcoming promotion), the DOC contends that

its nondiscriminatory reason for placing Eivins on the performance plan was for unscheduled

absences. “Eivins was placed on a performance plan regarding unscheduled absences on or around

September 6, 2018.” (DSOF #37). Eivins was placed on the performance plan prior to him having

gallbladder surgery. (DSOF #38). In July 2018, Eivins received a memorandum that warned him

he was taking too many unscheduled absences and that he may need to be put on a performance

plan. (DSOF #39). Eivins agrees that he was indeed absent on the dates listed in the July 2018

memorandum, with the exception of one date. (DSOF #40).10

 The evidence the DOC uses to support these claims is Eivins’s deposition, and Exhibit 7

to Eivins’s deposition, which includes a July 13, 2018, memorandum wherein Eivins was advised

that he would be placed on a performance plan if he had “any further incidents of unscheduled

leave.” (Emphasis added).

 We find that the DOC’s evidence does not support that placing Eivins on a performance

plan was due to unscheduled absences. It is true that Eivins admits to receiving the July 13, 2018,

memorandum which warned him that he might need to be placed on a performance plan. It is also

true that Eivins admits to being absent from work on all but one of the dates listed in the July

 10
 The DOC argued in its memorandum in support of summary judgment that Eivins could not contend that
he lost out on a promotion in the fall of 2018, because he never applied for a promotion. The DOC seems to have
abandoned this argument on appeal. Eivins’s deposition testimony was that being on a performance plan precluded
an employee from applying for a promotion.

 19
memorandum. Yet, the July memorandum expressly advises Eivins: “COI Eivins any further

incidents of unscheduled leave will result in placement on a[n] Employee Performance Plan for

Time and Attendance.” (Emphasis added). In its Statement of Uncontroverted Material Facts, the

DOC focuses solely on the July absences and suggests that the July memorandum was notice to

Eivins that he could potentially expect a performance plan due to those absences. But the evidence

supplied by the DOC shows that Eivins was told he would only be placed on a performance plan

if he had “further incidents of unscheduled leave.”

 The DOC does not allege in its statement of facts that Eivins had additional incidents of

unscheduled leave after the July warning. Although the July 13, 2018, notice lists every date Eivins

was alleged to have been absent, the September 6, 2018, notice informing Eivins that he was, in

fact, being placed on a performance plan lists no additional dates. Therefore, the fact that Eivins

admits to unscheduled absences in July 2018, and admits to being warned in July 2018 that he

might need to be placed on a performance plan, does not prove a legitimate, nondiscriminatory

reason for the DOC placing Eivins on a performance plan in September 2018. If anything, the

DOC’s evidence itself allows for inferences of pretext.11

 11
 The circuit court noted in its Judgment that Eivins admitted that a “supervisor met with him to address his
concerns about his Performance Plan and that they were resolved at the time of the meeting,” presumably suggesting
that the performance plan was not implemented to prevent Eivins from applying for an upcoming promotion. In
reviewing the meeting notes which were filed by the DOC with its Exhibit A, at the September 20, 2018 meeting,
Eivins disputed that he should have been placed on the performance plan for missed work at all, contending that he
thought the amount of overtime he worked should have replaced those absences. (Eivins’s supervisor’s June 8, 2018
recommendation letter states that “Eivins also works a significant amount of overtime on third shift; usually working
four or more hours daily in addition to working many of his weekends.”) Eivins further contested an alleged July 1,
2018, “No Call/No Show” because his orders had changed on that date and he thought he was off. The DOC
Memorandum states that, because Eivins’s new orders went into effect at 11:00 p.m. on a Saturday, his days off
changed and he should have been at work on the night disputed. The memorandum states that Eivins “understood the
confusion” and was no longer contesting the No Call/No Show.

 We do not find anything that occurred within this meeting that unquestionably supports the DOC’s claim that
it had a legitimate, nondiscriminatory reason for the performance plan, or that foreclosed Eivins from later claiming
that the performance plan was intended to prevent him from applying for upcoming promotions.

 20
 Conclusion Regarding DOC’s Showing of Nondiscriminatory Intent

 Because the DOC sets forth a variety of alleged legitimate, nondiscriminatory reasons for

promoting younger candidates over Eivins, and the DOC’s summary judgment evidence fails to

establish that its purported justifications were actual criteria for promotion which were consistently

applied to all candidates, we do not believe that the DOC has shown that it is entitled to summary

judgment on Eivins’s claim of discrimination. Nevertheless, assuming arguendo that the DOC has

made a facial showing of legitimate, nondiscriminatory reasons for failing to promote Eivins, we

discuss Eivins’s McDonnell Douglas rebuttal evidence.

 Eivins’s Response/Rebuttal to the DOC’s Assertions

 Eivins denies most of the DOC’s alleged uncontroverted material facts. Eivins denies the

DOC’s contention that Eivins was unable to demonstrate a working knowledge of policy and

procedure in his WMCC interview, contending that these were all self-serving claims made by the

DOC and subject to credibility determinations reserved to juries, particularly considering the DOC

later changed its evaluation of Stacy Yarbrough to justify promoting Yarbrough over Eivins. With

regard to the DOC’s alleged material fact that Eivins did not give as good of an interview as the

other WMCC candidates, Eivins denies this statement, alleging that Yarbrough was given an

interview score of 60, while Eivins was given an interview score of 72. With regard to the DOC’s

contention that Eivins’s lost interview documents and failure to come prepared to the Crossroads

interview did not reflect well on Eivins’s preparedness to promote to Sergeant, Eivins counters

that these claims are subject to credibility determinations exclusively reserved to juries, and Eivins

testified in his deposition that he did really well in the interview and had a strong interview. Eivins

contends the same with regard to the DOC’s claim that Eivins seemed unsure of himself in the

interviews, told stories instead of directly answering questions, and was not ready for a promotion.

 21
Eivins denies the DOC’s claim that he was placed on a performance plan in September 2018 due

to unscheduled absences, contending that he was placed on the plan to deter him from applying

for another sergeant position that was coming up. Eivins agrees that he received the July warning.

 Eivins responded to the DOC’s motion for summary judgment with his own statement of

uncontroverted material facts. Therein he contends that, despite being passed in favor of other

candidates for the WMCC promotion, he had been given a “merit score” greater than all of the

other applicants. Further, he had a strong interview and was given an interview score of 72, while

chosen applicant Stacy Yarbrough had an interview score of 60. He contends that, because both

Eivins’s interview and Yarbrough’s interview was noted as “adequate” but he had a higher merit

score, he should have been chosen over Yarbrough if the process was fair. Further, although

Yarbrough was chosen over Eivins, interview committee notations showed that Yarbrough “gave

vague answers” and “was unable to adequately show the responsibilities and/or the knowledge of

the Sergeant position.” Further, Yarbrough “need[ed] guidance from a supervisor to complete the

documentation” required by Departmental Policy and Procedure and “need[ed] more knowledge

and experience to make more appropriate policy and procedure-based decisions.”

 Eivins contends that the WMCC Interview Committee initially recommended three

candidates other than Eivins for the position, with Shenea Gardner as an alternate, and each of

these people are younger than Eivins. Two of the three people promoted had completed the training

academy just one month before their promotions, and each person promoted had merit scores lower

than Eivins. In August 2018, when an additional promotional opportunity came open at WMCC,

the DOC did not conduct new interviews for this vacancy but, instead, relied on the June 6, 2018

interviews. At the time of this promotional opportunity, Yarbrough was twenty-five years old and

had worked at the DOC for eighteen or nineteen months; Eivins was forty-nine years old and had

 22
worked for the DOC for fourteen years. Eivins’s supervisor stated that Eivins “possess[ed] all the

requisite skill set to promote,” while Yarbrough’s supervisor reported that she “lack[ed]

experience.” Further, to justify promoting Yarbrough in August 2018, the DOC changed

Yarbrough’s June 2018 interview evaluation. In the changed report, the DOC claimed Yarbrough

had previously been identified by the Interview Committee as the “second alternate,” but there was

never a “second alternate” and it was specifically recommended that Yarbrough not be promoted.

 With regard to the Crossroads job, five applicants were interviewed to fill five vacancies,

with only two candidates, Wade Smit and Rhett Mullins, ultimately promoted. Eivins had a higher

merit score than both Smit and Mullins.

 In support of Eivins’s responses, Eivins attached Exhibits which included: 1) Exhibit 1,

the June 7, 2018 WMCC Recommendation Letter; 2) Exhibit 2, the June 8, 2018 Crossroads

Recommendation Letter; 3) Exhibit 3, which also appears to be the WMCC Recommendation

Letter; 4) Exhibit 4, Eivins’s deposition; 5) Exhibit 5, which includes a variety of documents, all

of which are Bates stamped in the lower right-hand corner with “Michael Eivins v. MDOC –

MDOC [document #],” with the exception of the final document which is a Charge of

Discrimination filed by Eivins with the Missouri Commission on Human Rights; 6) Exhibit 6, a

June 8, 2018, letter/internal memorandum on DOC letterhead from Captain John Lower to Captain

Michael Penland (who was on Eivins’s WMCC interview panel), discussing Eivins’s strengths and

concluding that he believed “Eivins possesses the requisite skill set to promote to the rank of

Corrections Officer II”; 7) Exhibit 7, an August 1, 2018, email from Jeromy Carr to Mike Penland,

discussing Yarbrough’s strengths and concluding that, “though she lacks experience, her ability to

learn makes her a strong candidate for advancement”; 8) Exhibit 9 (there appears to be no Exhibit

8 in the electronic file), an excerpt from a deposition of Stacy Yarbrough, wherein she discusses

 23
her age and time of employment with the DOC, 9) Exhibit 10, an excerpt from Penland’s

deposition wherein he states that the panel chose one alternate that day and the committee’s

recommendation letter did not mention a second alternate, 10) Exhibit 11, an excerpt from WMCC

Warden Korneman’s deposition wherein she acknowledges that negative portions of the WMCC

Recommendation Letter were changed when Yarbrough was recommended for the fourth WMCC

spot that opened up less than two months after Yarbrough’s interview; 11) Exhibit 12, Eivins’s

October 22, 2018 Charge of Discrimination wherein he alleged age discrimination, retaliation,

hostile work environment, and that the discrimination was continuing; 12) Exhibit 13, an excerpt

from a deposition of DOC investigator Tonya Youngs wherein she states that she began her

investigation into Eivins’s claims on July 11, 2019; and 13) Exhibit 14, Eivins’s Second Amended

Petition for Damages.

 In Reply to Eivins’s “Suggestions in Opposition to Defendant’s Motion for Partial

Summary Judgment” which included Eivins’s Response to the DOC’s “Statement of

Uncontroverted Material Facts,” and Eivins’s own “Statement of Uncontroverted Facts,” the DOC

argued that the selection process was ultimately based on interview performance, and Eivins

admitted that he did not witness the other interviews and, therefore, did not know how he

performed in comparison. The DOC added an additional material fact which stated that merit

scores are based on a candidate’s background and education and primarily used to determine which

candidates are awarded an interview, and a high merit score does not necessarily reflect that the

candidate will be selected. The DOC countered Eivins’s contention that Eivins’s supervisor had

recommended him for promotion with positive statements (while Yarbrough’s supervisor

submitted a recommendation that was not as positive) with an added material fact that, “In the case

of the WMCC interviews, the interview committee was not supposed to use letters of

 24
recommendation anymore ‘because people use the same ones over and over and not up-to-date

ones,’” though the interview committee did read the recommendations.

 Notably, the DOC replied to all of Eivins’s responses to the DOC’s Statement of

Uncontroverted Material Facts by claiming that Eivins had not actually controverted the fact as

originally stated, requiring the fact to be deemed uncontroverted. For example, DSOF #25 states:

“Eivins did not give as good of an interview as the other candidates who were ultimately chosen

for the position at WMCC.” Eivins responded with: “Controverted. Stacy Yarbrough was given

interview score of 60 while Mr. Eivins was given an interview score of 72 (Exhibit 5, MDOC

0951-0959).” The DOC replied with: “Plaintiff’s response has not actually controverted the fact

as originally stated; therefore, this fact should be deemed uncontroverted for the purpose of

summary judgment. The original fact as stated did [not] state any scores of any particular

candidates.”

 Of the forty-three material facts Eivins set forth, the DOC agreed that thirteen were

uncontroverted, and one was partially uncontroverted. The DOC considered one a legal

conclusion, and unnecessary to address. The DOC expressly denied only two of Eivins’s forty-

three alleged material facts. In response to most of Eivins’s statements of fact, the DOC contended

that the fact must be disregarded because the supporting exhibits contained hearsay or had not been

authenticated and were, therefore, inadmissible at trial and for purposes of summary judgment.

(The DOC makes the same claims on appeal).

 Yet, the vast majority of the documents relied upon by Eivins, and disputed as

unauthenticated and hearsay by the DOC, are documents the DOC provided to Eivins in discovery.

As an example, Eivins’ Exhibit 1 is the WMCC Recommendation Letter. He cited this exhibit

with regard to each statement Eivins makes regarding the WMCC interviewers’ conclusions

 25
regarding Stacy Yarbrough’s interview and the merit scores of the candidates. The DOC’s repeated

response to any Statement of Fact by Eivin that attached discovery documentation supplied by the

DOC was the following:

 Defendant’s response: Plaintiff’s exhibits do not support the fact as
 stated and contain hearsay; therefore, they must be disregarded. “Hearsay
 statements cannot be considered in ruling on the propriety of summary
 judgment. Only evidence that is admissible at trial can be used to sustain or
 avoid summary judgment. Documents, to be admissible, must meet
 authentication and hearsay foundational requirements.” Jones v. Union
 Pacific Railroad Co., 508 S.W.3d 159, 162 (Mo. App. S.D. 2016) (internal
 citations omitted). Here, Plaintiff merely attaches a document containing
 hearsay to his statement of fact and thus the document cannot be used when
 considering summary judgment.

The DOC made these claims despite the fact that the Pierce, Penland, and Shaw affidavits attested

that the WMCC Recommendation Letter and the Crossroads Recommendation Letter were

business records of the DOC. 12

 Further, and significantly, Rule 74.04(c)(3) provides that, if the adverse party’s response to

the motion for summary judgment sets forth additional material facts that remain in dispute,

“movant shall set forth each additional statement of fact in its original paragraph number and

immediately thereunder admit or deny each such factual statement.” (Emphasis added). “Denials

shall be supported in the manner prescribed by Rule 74.04(c)(2),” which requires the denial to be

supported “with specific references to the discovery, exhibits or affidavits that demonstrate specific

facts” showing that, in the case of a movant, there is no genuine issue for trial. For the vast majority

of Eivins’s statements of fact, the DOC neither denied the averments, nor provided references to

 12
 The WMCC Recommendation Letter and the Crossroads Recommendation Letter, which Eivins attached
as evidence in approximately twenty of his statements of fact, are exact copies of the WMCC Recommendation Letter
and Crossroads Recommendation Letter authenticated by the DOC as DOC business records in evidence attached to
the DOC’s own statement of facts.

 26
discovery, exhibits, or affidavits to demonstrate specific facts showing that Eivins’s statements did

not present a genuine issue for trial. A response that does not comply with Rule 74.04(c)(2) with

respect to any numbered paragraph in a statement of facts “is an admission of the truth of that

numbered paragraph.” Id. (Emphasis added). The DOC, therefore, admitted all but two or three

of Eivins’s forty-three statements of fact.

 The DOC’s contention that the court was required to ignore Eivins’s exhibits that included

discovery provided by the DOC, arguing that the documentation contains hearsay and has not been

authenticated, is inaccurate. In L.A.C. ex rel. D.C. v. Ward Parkway Shopping Center Co., L.P., a

defendant made a similar claim, contending that the defendant security company’s incident reports

which were submitted by the plaintiff in response to a motion for summary judgment were hearsay

and unauthenticated. 75 S.W.3d 247, 253 n.3 (Mo. banc 2002). The Missouri Supreme Court

concluded that, “Defendant cannot defeat summary judgment based on an objection regarding any

supposed failure to authenticate records that they provided and to which they make no specific

denial regarding their authenticity.” Id.

 While the DOC claims that L.A.C. actually requires authentication of such records when

the Court stated that, “[i]f properly authenticated and within a recognized hearsay exception, these

may be admissible …”, this is a mischaracterization of the Court’s holding. This quoted statement

clearly regards police reports that were attached to the defendant’s internal incident reports, and

not the defendant’s internal incident reports themselves. The Court clarified that the police reports

might be admissible if properly authenticated and within a recognized hearsay exception, but that

 27
internal incident reports produced by the security company during discovery did not require

authentication, particularly where the defendant did not deny the authenticity of the records.13

 Conclusion Regarding Eivins’s McDonnell Douglas Rebuttal Evidence

 We believe that, even if the DOC’s factual claims and supporting evidence made a prima

facie showing of legitimate, nondiscriminatory reasons for the DOC not promoting Eivins, Eivins

successfully rebutted these with undisputed evidence that, among other things, he had been given

a higher merit score than any other candidate, Yarbrough was promoted over him with a lower

merit score and only an “adequate” interview, Yarbrough’s supervisor’s recommendation was less

positive than Eivins’s, and Yarbrough’s negative interview summary was later changed to support

promoting Yarbrough.

 DOC’s Reply Statement of Facts to Rebut Eivins’s Rebuttal Evidence

 We find that the DOC’s reply Statement of Material Facts, intended to rebut Eivins’s

rebuttal evidence with an affidavit proclaiming that merit scores have no significance in the

selection process and the selection is primarily based on interviews, is insufficient to rebut Eivins’s

evidence of potential pretext and resurrect any purported prior showing of nondiscriminatory

 13
 The L.A.C. court cited to Lutsky v. Blue Cross Hospital Service, Inc., 695 S.W.2d 870, 872 (Mo. banc
1985), which relied on Rule 55.23. Although Rule 55.23 was repealed in 2018, the rule contained wording nearly
identical to Section 509.240, RSMo 2016, which is still in effect and states:

 When any claim or counterclaim shall be founded upon any written instrument and the same shall
 be set up at length in the pleading or a copy attached thereto as an exhibit, the execution of such
 instrument shall be deemed confessed unless the party charged to have executed the same shall
 specifically deny the execution thereof.

Defendants in Lutsky argued that exhibits had not been properly authenticated and, therefore, were not appropriate for
summary judgment. 695 S.W.2d at 872. The Court determined that the defendant should have clearly stated its
position if an issue of authenticity of a document was intended to be raised. Id. Having failed to raise a specific denial
as to authenticity, the defendants must be held to have judicially admitted that the documents came from them. Id.
Consequently, the exhibits were properly before the court for consideration in ruling on the motion for summary
judgment. Id.

 28
intent. Although the DOC contends via an affidavit by Dwight Pollite of the DOC Office of

Personnel that the “merit scores,” which reflect “previous work history, military service, education,

and other background factors,” have no significance in the selection process, the DOC’s Exhibits

B, C, and E do not support this claim. The merit scores are listed beside each candidate in both

the WMCC Recommendation Letter and the Crossroads Recommendation Letter, suggesting that

they have some significance. Notably, the narratives for the WMCC promoted candidates

Baldwin, Montague, and Gardner, and the Crossroads promoted candidate Smit, all discuss

employment and/or military history as part of the recommendation, revealing that the merit score

criteria which Pollite attested is comprised of work history, military history, etc., is in fact

important to and used to support advancement. Eivins’s fourteen years of experience at the DOC

and work history with other correctional institutions is not mentioned at all in the narratives

discussing Eivins. Hence, Pollite’s statement that the interview committee recommends

candidates based on interview performance is not unquestionably supported by the DOC’s

evidence (i.e., the WMCC Recommendation Letter and the Crossroads Recommendation Letter)

which details candidate attributes other than interview performance, including merit score criteria.

 The DOC’s added material fact in response to Eivins’s claim that his supervisor

recommended him and gave a more glowing recommendation than Yarbrough’s states: “In the case

of the WMCC interviews, the interview committee was not supposed to use letters of

recommendation anymore ‘because people use the same ones over and over and not up-to-date

ones.’” Given the DOC’s own evidence, we find that this fact does nothing to resurrect any

potential prior showing that the DOC had nondiscriminatory motives for failing to promote Eivins.

 In the WMCC Recommendation Letter, each of the recommended candidates have a

paragraph dedicated to statements made by each of their supervisors. With regard to a candidate

 29
not selected, it is even noted that the candidate’s supervisor “was contacted and did not respond

back.” Nothing was noted with regard to statements by Eivins’s supervisor, which were

undisputedly positive.14 Notably, the letter from Yarbrough’s supervisor Jeromy Carr to Penland,

that Penland claims he was not allowed to consider, was actually quoted in the August 6, 2018,

Board Recommendation letter, signed by Penland, which recommended Yarbrough for promotion.

This statement of fact is, therefore, not supported by the DOC’s own exhibits and directly

contradicted by the August 6, 2018, Yarbrough recommendation letter which was in Eivins’s

Exhibit 5.

 Conclusion

 We conclude that material facts remain in dispute as to whether the DOC’s reasons for

failing to promote Eivins constitute legitimate, nondiscriminatory justifications. The circuit court

erred in granting summary judgment to the DOC on Eivins’s MHRA age discrimination claim.

 Eivins’s second point on appeal is granted.

 Point III – Summary Judgment as to Hostile Work Environment

 In his third point on appeal, Eivins contends that the circuit court erred in granting the DOC

summary judgment as to Eivins’s hostile work environment claim, contending the circuit court

improperly disregarded tangible employment actions that are legally sufficient to support a hostile

work environment claim, evaluated each paragraph of Eivins’s petition individually and failed to

consider the totality of the circumstances, disregarded uncontroverted evidence of a hostile work

 14
 Eivins’s supervisor states that Eivins was assigned to “1 st shift.” He states that Eivins “is a dependable
Officer who typically provides a doctor’s note for his unscheduled leave even when he is not required to do so.” He
states that “Eivins works well with his supervisors and is will[ing] to do whatever is asked of him without complaint.”
He “conducts quality searches of the Food Service area and Offenders.” He “produces acceptable documentation and
is willing to provide follow up documentation when required.” He “works a significant amount of overtime on third
shift; usually working four or more hours daily in addition to working many of his weekends.” Captain Lower believed
Eivins to possess “the requisite skill set to promote to the rank of Corrections Officer II.”

 30
environment, and improperly ignored events a jury could have considered as background evidence

when determining if Eivins’s work environment was abusive. Eivins alleged in support of his

claims of a hostile work environment that the DOC failed to promote him, placed him on a

performance plan to deter him from applying for a promotion, falsely accused him of drinking on

the job, nitpicked Eivins about how he did his job, and Eivins’s employment was constructively

terminated due to the harassment.

 The DOC contends that, because the circuit court found that Eivins was not promoted for

legitimate, nondiscriminatory, nonpretextual reasons, Eivins cannot claim that the DOC’s failure

to promote him is part of his hostile work environment claim. Further, Eivins cannot use the same

allegations to support both his discrimination and hostile work environment claims, as Eivins could

then improperly recover twice for the same injury. Finally, the DOC contends that Eivins’s

remaining allegations of being falsely accused of drinking on the job and being nitpicked do not

rise to the level of harassment required for a hostile work environment claim.15

 First, Eivins is not barred from relying on the same evidence to support multiple theories

of liability. A party may pursue multiple theories of liability, but cannot recover duplicative

damages for the same wrong. R.J.S. Sec., Inc. v. Command Sec. Services, Inc., 101 S.W.3d 1, 17

(Mo. App. 2003). While a double recovery for the same wrong is deemed an impermissible

windfall, a party may be made whole by one compensatory damage award for multiple theories.

Hammett v. Atcheson, 438 S.W.3d 452, 464 (Mo. App. 2014). Hence, the fact that Eivins’s age

discrimination claim involved failure to promote allegations does not preclude Eivins from raising

these same allegations in his hostile work environment claim.

 15
 The DOC also argues that Eivins’s summary judgment evidence supporting his claims were not properly
authenticated in compliance with Rule 74.04, and must be ignored.

 31
 A successful claim of a hostile work environment requires the plaintiff to show: (1) he is a

member of a group protected under the MHRA; (2) he was subjected to unwelcome harassment;

(3) the plaintiff’s membership in the protected group was a motivating factor in the harassment;

and (4) a term, condition, or privilege of the plaintiff’s employment was affected by the

harassment. McGaughy, 604 S.W.3d at 748. “A plaintiff can show that harassment affected a

term, condition, or privilege of [his] employment by showing a tangible employment action, or an

abusive working environment.” Id. In assessing the hostility of an environment, we look to the

totality of the circumstances. Id. “A tangible employment action is a significant change in

employment status,’ and ‘the means by which the supervisor brings official power of the enterprise

to bear on subordinates.” Id. at 749 (internal quotation marks and citations omitted). Some

examples of tangible employment actions include failure to promote, undesired reassignment, and

a decision causing a significant change in work assignments. Id. (internal quotation marks and

citations omitted). The discriminatory harassment additionally affects a term, condition, or

privilege of employment when it is “sufficiently severe or pervasive enough to alter the conditions

of the plaintiff’s employment and create an abusive working environment.” Id. at 748 (internal

quotation marks and citations omitted). A Plaintiff must only show that harassment affected a

term, condition, or privilege of employment by either causing a tangible employment action or an

abusive working environment. Id. “Once evidence of improper conduct and subjective offense is

introduced, it is largely up to the jury to determine if the conduct rose to the level of being abusive.”

McKinney v. City of Kan. City, 576 S.W.3d 194, 199 (Mo. App. 2019) (internal quotation marks

and citation omitted).

 In Eivins’s second point on appeal, we determined that material facts remain in dispute as

to whether Eivins’s age was a motivating factor in the DOC failing to promote Eivins. The DOC

 32
does not deny that Eivins’s other allegations occurred, but contends that they are “so banal that

they simply cannot be used to support his claim of hostile work environment.” It contends that the

false accusation of drinking on the job is insignificant, because Eivins was never required to take

a breathalyzer, and the allegations of “nitpicking” are insignificant.

 As discussed above, the DOC did not deny or contradict with evidence the vast majority

of Eivins’s Statements of Uncontroverted Material Fact, including that after Eivins filed his first

Charge of Discrimination he was constantly nitpicked, and that in March 2019 Eivins was falsely

accused of drinking on the job.

 We find that material facts remain in dispute as to whether a jury could conclude that the

DOC’s failure to promote Eivins, placement of Eivins on a performance plan, nitpicking of Eivins,

and false allegations of drinking on the job, individually or collectively, constitute unwanted

harassment with Eivins’s age being a motivating factor in that harassment.

 The circuit court erred in granting summary judgment to the DOC on Eivins’s hostile work

environment claim. Eivins’s third point on appeal is granted.16

 16
 We note that the DOC raises for the first time on appeal that Eivins allegedly failed to exhaust his
administrative remedies with regard to his constructive discharge and nitpicking allegations, arguing that he did not
include these allegations in his charge of discrimination. This was not raised in the DOC’s motion for summary
judgment, and we will not address it other than to note that the DOC’s Statement of Fact #76 states that Eivins’s May
2019 Charge of Discrimination alleges that, “I feel as though I was constructively discharged and had no other option
but to end my employment with the DOC due to the continuous and ongoing discrimination, retaliation and hostile
work environment. I was falsely accused of drinking at and before work, which has never happened. This false
accusation is further discrimination”.

 33
 Point IV – Summary Judgment as to Retaliation

 In Eivins’s fourth point on appeal, he contends that the circuit court erred in granting the

DOC’s motion for summary judgment as to Eivins’s retaliation claim, arguing that genuine issues

of material fact exist and the trial court failed to consider Eivins’s evidence of retaliation and

improperly gave the DOC the benefit of inferences from the evidence. The DOC contends that the

drinking on the job accusations and nitpicking do not rise to the level of an adverse action simply

because it was upsetting to Eivins.

 The MHRA makes it an unlawful discriminatory practice to retaliate “in any manner”

against an employee who “has opposed any practice prohibited by this chapter” or “has filed a

complaint … pursuant to this chapter.” Soto v. Costco Wholesale Corp., 502 S.W.3d 38, 47-48

(Mo. App. 2016) (quoting § 213.070(2)). To make a submissible case for retaliation under the

MHRA, Eivins must establish that: (1) he complained of discrimination; (2) the DOC took adverse

action against him; and (3) a causal relationship existed between the complaint and the adverse

action. Id. at 48. With regard to the adverse action requirement, “a plaintiff alleging unlawful

retaliation need only establish that, as a direct result, he or she suffers any damages.” Mignone v.

Missouri Department of Corrections, 546 S.W.3d 23, 36 (Mo. App. 2018) (internal quotation

marks and citation omitted). Eivins must satisfy the causation standard by demonstrating that his

complaint of discrimination was a “motivating factor” in the DOC’s adverse employment action

by providing direct evidence of retaliation, or creating an inference of retaliation under the

McDonnel Douglas burden-shifting framework. Soto, 502 S.W.3d at 48; § 213.101.4; Donathan

v. Oakley Grain, Inc., 861 F.3d 735, 740 (8th Cir. 2017).

 The DOC does not dispute that Eivins filed a Charge of Discrimination in October 2018.

The DOC has not denied, and therefore has admitted, Eivins’s PSOF #37 which states that, “After

 34
filing the first Charge of Discrimination in October 2018, Defendant constantly nitpicked Mr.

Eivins.” Rule 74.04(c)(2). Eivins references two pages of his deposition testimony wherein he

discusses action taken by the DOC that he believes constitutes nitpicking. The DOC’s response

that, “This statement of fact is incomplete and thus must be disregarded. The statement of fact is

incomplete and does not state what was apparently nitpicked,” is insufficient to represent a denial.

 Likewise, the DOC does not expressly deny Eivins’s PSOF #38 which states that, “In

March 2019, Defendant accused Mr. Eivins of drinking on the job” and references two pages of

Eivins’s deposition testimony wherein he describes this incident. The DOC responds:

 The deposition testimony cited does not support the fact as stated; therefore, this
 statement of fact must be disregarded. The deposition testimony does not establish
 that Defendant accused him of drinking on the job, but rather establishes that Ms.
 Davidson accused him of drinking on the job. As established in prior statements of
 fact, Defendant did not even make Mr. Eivins take a breathalyzer test so clearly,
 Defendant did not accuse him of drinking.17

We find that by not denying this statement, the DOC has admitted it.

 The DOC expressly admits, for the purpose of summary judgment, Eivins’s PSOF #40

which states that: “The repeated failures to promote, deterring him from applying for other

promotions, being constantly nitpicked, and being accused of drinking on the job affected Mr.

Eivins physically and mentally, including causing him to lose sleep.”

 We find that Eivins’s material facts and supporting evidence are sufficient to create an

inference of retaliation and to rebut any evidence presented by the DOC that the actions were not

motivated by Eivins’s complaints of discrimination, and that material facts remain in dispute as to

 17
 According to Eivins’s responses to the DOC’s statement of facts, Eivins suggested that he take a
breathalyzer after the accusation was made, and the DOC did not give him one.

 35
whether Eivins’s complaint of discrimination was a motivating factor in Eivins being accused of

drinking on the job and nitpicked, all of which allegedly resulted in Eivins suffering damages.

 Eivins’s fourth point on appeal is granted.

 Conclusion

 For the foregoing reasons, we find that the circuit court 1) did not err in applying the

motivating factor standard to Eivins’s MHRA claims against the DOC, 2) erred in granting

summary judgment to the DOC on Eivins’s MHRA age discrimination claim, 3) erred in granting

summary judgment to the DOC on Eivins’s MHRA hostile work environment claim, and 4) erred

in granting summary judgment to the DOC on Eivins’s MHRA retaliation claim. We affirm the

circuit court’s judgment as to application of the motivating factor standard, reverse as to the circuit

court’s grants of summary judgment to the DOC, and remand to the circuit court for further

proceedings consistent with this opinion.

 Anthony Rex Gabbert, Judge

All concur.

 36